Reardon, J.*
*864 This criminal prosecution is the result of multiple charges brought against two co-defendants-Jabrie Bennett and Andre Smith[1] (collectively, appellants)-in connection with a January 2013 altercation, between two groups of teenagers outside of the Bayfair BART station in San Leandro, which escalated to the point where shots were fired and Kenneth Seets, an innocent bystander, was killed. Bennett was additionally prosecuted for the attempted murder of Donnell Jordan, based on an unrelated incident that occurred two days prior to the BART shooting and involved the same gun. In the published portion of our opinion, we address and reject appellants' assertion that the prosecutor improperly used three of his peremptory challenges to excuse potential jurors because they were Black, in violation of Batson v. Kentucky (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 ( Batson ) and People v. Wheeler (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 ( Wheeler ). In the unpublished portion of our opinion, we agree with Bennett that the trial court should reconsider his *865 sentence in light of *295 recent amendments to Penal Code section 12022.53,[2] and otherwise reject appellants' numerous other contentions.
I. BACKGROUND
A. The BART Shooting of Kenneth Seets
On January 19, 2013, two sets of teenagers found themselves at an AC Transit bus station immediately adjacent to the Bayfair BART terminal in San Leandro. In addition to himself, Bennett's group included his girlfriend, Antilea Beal, Beal's cousin, Ylea Means, and Means' boyfriend, Roland Smith. The members of this group had just come from the Bayfair Mall and were talking and smoking marijuana. A second group arrived comprised of Smith, his brother Askari Smith, and an acquaintance, Ryan Purry. Askari stated that Smith and Purry had initially appeared to be having a disagreement, but then they shook hands and all three smoked marijuana together. Since the two groups were standing near a bus, multiple video cameras on that bus recorded the subsequent altercation between them.
Specifically, a verbal exchange started when someone in Smith's group (apparently Askari) asked Roland if he knew them and why he was staring at them. Askari testified that Roland was "mugging," that is, looking hostilely at them. During some back and forth, largely between Beal and Askari, Beal reportedly made the statement: "Got something bigger than y'all poor [or little] ass niggas." Askari took this to mean that she had a gun. A bystander testified that someone from Smith's group said something like: "You won't be able to do anything when there is a gun pointed at you." And Bennett told Smith's group to stop talking to his girl like that.
Shortly thereafter, Smith appeared to grip something near his waist and walk towards Bennett's group. Smith later admitted to the police that he was clenching a gun tucked into his waistband. He claimed he just wanted the other group to shut up and leave them alone. According to Roland, however, as Smith advanced, he said: "I'll spark this" or "I'll clear it out." Roland believed this meant Smith would start shooting. Although there were obvious credibility issues given the circumstances-and no firearm could later be seen by a forensic analyst on relevant video-Roland, Beal, and Bennett all testified that they saw Smith with a gun. Bennett then pulled out a semiautomatic firearm he had been carrying in a duffle bag and started shooting in Smith's direction while backing up. He fired two or three shots and then hit a pole and fell down. After he got back up, he continued to fire, emptying his clip. Askari testified that after Bennett fell, he heard more shots and saw *866 Smith on the ground. Askari then pulled out his own handgun and fired approximately five shots. Seets, a 50-year-old man who had been waiting for the bus, was fatally shot by a bullet which was later determined to be consistent with having been fired by Bennett's weapon.
B. The Attempted Murder of Donnell Jordan
On January 17, 2013, two days before the BART shooting described above, Donnell Jordan-a 17-year old high school student-was discovered lying in the street near 89th and Hillside in Oakland with a gunshot wound to his lower back. Jordan told the police officer who responded to the scene that he had been shot by someone he had seen before, a black male who wore dreadlocks. Thereafter, Jordan repeatedly refused to identify his assailant.
*296 However, his cousin, Nicole Walton, told the police that Jordan had identified Bennett as the shooter when she visited him in the hospital shortly after the incident. In addition, Jordan reportedly pulled up a picture of Bennett on Facebook and Walton took pictures of the Facebook page, which she later transmitted to the police. These pictures were introduced at trial. After Walton identified Bennett to the police, investigators compared the cartridge casings from the BART shooting and the Jordan shooting. The 11 casings recovered from the Jordan shooting and the 9 casings recovered from the BART shooting all came from the same gun, the Sig Sauer .22 semi-automatic rifle that the police had located in a bush after the BART shooting.
At trial, Jordan admitted that he knew Bennett from the neighborhood; that he had been to Bennett's house; and that the two had smoked marijuana together on several occasions. Bennett lived about two blocks from where Jordan was shot. Jordan further testified that, during the two months before he was shot, his relationship with Bennett deteriorated and, on the day of the shooting, he and Bennett exchanged words while Jordan was on his way to school. Bennett hit Jordan, and then Jordan hit Bennett several times, causing him to stumble. Jordan remembered seeing a long black gun, but could not say who was holding it. He ran away, hearing 9 or 10 shots fired before he was ultimately shot in the back as he moved out from behind a car where he had taken cover. Jordan denied ever telling Walton that Bennett was the shooter.
C. Procedural History
As a result of these incidents, an information was filed by the Alameda County District Attorney on September 20, 2013, charging Bennett and Smith with the murder of Seets (§ 187, subd. (a) ). The information further alleged with respect to this murder charge that both Smith and Bennett personally used a firearm during the commission of the crime (§§ 12022.5, subd. (a), *867 12022.53, subds. (b) & (g) ) and that Bennett personally and intentionally discharged a firearm and personally inflicted great bodily injury ( §§ 12022.53, subds. (c) & (d), 12022.7, subd. (a) ). Bennett was also charged with the attempted premeditated murder of Jordan (§§ 187, subd. (a), 664, subd. (a) ), with attendant great bodily injury, use of a firearm, and discharge of a firearm allegations (§§ 12022.5, subd. (a), 12022.53, subds. (b)-(d) & (g), 12022.7, subd. (a) ). Finally, Bennett was charged with assault with a semiautomatic firearm in connection with the Jordan shooting, again with great bodily injury and firearm use allegations (§§ 245, subd. (b), 1203.06, subd. (a)(1), 12022.5, subd. (a) & 12022.7, subd. (a) ). Smith, in addition to the Seets's murder, was charged with possession of a firearm by a felon (§ 29800, subd. (a)(1) ).[3]
At trial, the prosecutor argued that Bennett was guilty of the murder of Seets under a theory of transferred intent, as Seets was killed accidentally while Bennett was attempting to kill Smith. He maintained, however, that Smith was a concurrent cause of Seets's death and was therefore also guilty of murder under a "provocative act" theory. Specifically, the prosecution argued that, by putting his hand on the gun in his waistband and walking forward aggressively toward Bennett's group, Smith committed a provocative act sufficient to make him culpable for *297 Seets's murder based on Bennett's foreseeable reaction. Bennett argued that he was not guilty of Seets's murder because he fired his weapon in either complete or imperfect self-defense, fearing Smith was going to shoot. Smith claimed that his behavior was insufficient to support a murder charge. As for the charges related to Jordan, Bennett asserted that he was not the shooter, having purchased the gun used at the BART station on the day in between that shooting and the shooting of Jordan.
On March 13, 2014, the jury found Bennett guilty of the second degree murder of Seets, the first degree attempted murder of Jordan, and assault with a semiautomatic firearm with respect to the Jordan incident. It additionally found all corresponding enhancements and special allegations with respect to these crimes to be true. Smith, in contrast, was acquitted on the murder charge, but found guilty of unlawful possession of a firearm.
Thereafter, on April 11, 2014, the trial court sentenced Bennett to a prison term of 15 years to life on the murder count and a consecutive prison term of seven years to life on the attempt murder count. In addition, consecutive enhancements of 25 years to life were imposed on each of these counts, as then mandated by section 12022.53, subdivision (d). The assault count and all *868 other enhancements were stayed. Thus, in total, Bennett received a sentence of 72 years to life. With respect to Smith's gun possession charge, in contrast, the trial court imposed and suspended execution of the aggravated term of three years, and admitted him to probation for a five-year period. Appellants' timely notices of appeal now bring the matter before this court.
II. CLAIM OF BATSON/WHEELER ERROR
Bennett and Smith, who are Black, argue that they were deprived of their constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges in this case to exclude certain Black prospective jurors.[4] (See Batson , supra , 476 U.S. 79, 106 S.Ct. 1712 ; Wheeler , supra , 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748.) The law in this area is well settled. " '[A] party may exercise a peremptory challenge for any permissible reason or no reason at all' [citation] but 'exercising peremptory challenges solely on the basis of race offends the Fourteenth Amendment's guaranty of the equal protection of the laws' [citations]. Such conduct also 'violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.' " ( People v. Smith (2018) 4 Cal.5th 1134, 1146, 233 Cal.Rptr.3d 1, 417 P.3d 662 ( Smith ).) " 'The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." ' " ( People v. Hardy (2018) 5 Cal.5th 56, 76, 233 Cal.Rptr.3d 378, 418 P.3d 309 ( Hardy ), quoting Foster v. Chatman (2016) 578 U.S. ----, ----, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1, quoting Snyder v. Louisiana (2008) 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175.)
When a defendant alleges discriminatory use of peremptory challenges, a three-step procedure applies. " 'First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges *298 were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " ( People v. Jones (2011) 51 Cal.4th 346, 360, 121 Cal.Rptr.3d 1, 247 P.3d 82 ( Jones ); see also Smith , supra , 4 Cal.5th at p. 1147, 233 Cal.Rptr.3d 1, 417 P.3d 662.)
If, under the second stage of a Batson / Wheeler analysis, a prosecutor is asked to justify his or her conduct in exercising peremptory challenges, that prosecutor must provide a " ' " 'clear and reasonably specific' " ' explanation of his or her 'legitimate reasons' " for exercising the challenges.
*869 ( Jones , supra , 51 Cal.4th at p. 360, 121 Cal.Rptr.3d 1, 247 P.3d 82.) " 'The prosecutor's justification does not have to support a challenge for cause, and even a trivial reason, if genuine and race neutral, is sufficient. The inquiry is focused on whether the proffered neutral reasons are subjectively genuine , not on how objectively reasonable they are. The reasons need only be sincere and nondiscriminatory.' " ( Hardy , supra , 5 Cal.5th at p. 76, 233 Cal.Rptr.3d 378, 418 P.3d 309.)
Thereafter, under the third stage of a Batson / Wheeler inquiry, the " ' "critical question" ' " facing the trial court " ' "is the persuasiveness of the prosecutor's justification for his peremptory strike." ' " ( Smith , supra , 4 Cal.5th at p. 1147, 233 Cal.Rptr.3d 1, 417 P.3d 662, quoting Miller-El v. Cockrell (2003) 537 U.S. 322, 338-339, 123 S.Ct. 1029, 154 L.Ed.2d 931.) Generally, resolution of this issue " 'comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation and footnote omitted.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." ( People v. Lenix (2008) 44 Cal.4th 602, 613, 80 Cal.Rptr.3d 98, 187 P.3d 946 ( Lenix ).)
In addition, at the third stage of a Batson / Wheeler review, " 'a defendant may engage in "comparative juror analysis"; that is, [the defendant] may compare the responses of the challenged jurors with those of similar unchallenged jurors who were not members of the challenged jurors' racial group.' " ( Hardy , supra , 5 Cal.5th at p. 77, 233 Cal.Rptr.3d 378, 418 P.3d 309.) The individuals compared for purposes of such an analysis " 'need not be identical in every respect aside from ethnicity[,] ... [b]ut they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.' " ( Ibid. ) This form of circumstantial evidence " 'is relevant, but not necessarily dispositive, on the issue of intentional discrimination.' " ( Smith , supra , 4 Cal.5th at pp. 1147-1148, 233 Cal.Rptr.3d 1, 417 P.3d 662.)
"[C]omparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard." ( Lenix , supra , 44 Cal.4th at p. 624, 80 Cal.Rptr.3d 98, 187 P.3d 946.) However, we must consider such evidence, even if raised for the first time on appeal, whenever it is relied upon by the defendant and *299 the record is adequate to permit the urged comparisons. ( Smith , supra , 4 Cal.5th at p. 1148, 233 Cal.Rptr.3d 1, 417 P.3d 662.) Nevertheless, our review under such circumstances is " 'necessarily circumscribed.' " ( Ibid . ) For instance, a reviewing court "need *870 not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment." ( Lenix , supra , 44 Cal.4th at p. 624, 80 Cal.Rptr.3d 98, 187 P.3d 946.)
Finally, as a general matter, our review of a trial court's denial of a Batson / Wheeler motion is deferential, "examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' " ( Lenix , supra , 44 Cal.4th at pp. 613-614, 80 Cal.Rptr.3d 98, 187 P.3d 946 ; see also Smith , supra , 4 Cal.5th at pp. 1147-1148, 233 Cal.Rptr.3d 1, 417 P.3d 662 [since " ' " 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province" ' " ... in reviewing a trial court's reasoned determination that a prosecutor's reasons for striking a juror are sincere, we typically defer to the trial court' "].) Moreover, where, as here, " 'comparative juror arguments are made for the first time on appeal, ... the prosecutor was not asked to explain, and therefore generally did not explain, the reasons for not challenging other jurors. In that situation, the reviewing court must keep in mind that exploring the question at trial might have shown that the jurors were not really comparable. Accordingly, we consider such evidence in light of the deference due to the trial court's ultimate finding of no discriminatory purpose.' " ( Hardy , supra , 5 Cal.5th at p. 77, 233 Cal.Rptr.3d 378, 418 P.3d 309.)
Of course, restraint in this context does not mean abdication. ( Hardy , supra , 5 Cal.5th at p. 76, 233 Cal.Rptr.3d 378, 418 P.3d 309.) " ' "Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror ." ' " ( Ibid. , italics added.) Moreover, while " '[s]ome neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication[,] ... when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing.' " ( Id. at p. 77, 233 Cal.Rptr.3d 378, 418 P.3d 309.) And, " '[t]hat is particularly so when ... an advocate uses a considerable number of challenges to exclude a large proportion of members of a cognizable group.' " ( Ibid. )
With this established framework in mind, we turn to the specifics of the trial court's Batson / Wheeler analysis in this case.
*871 A. Trial Court Process and General Conclusions
During jury selection in these proceedings, defense counsel objected on Batson / Wheeler grounds after each of the prosecutor's four peremptory challenges to Black jurors. At the close of the voir dire, the trial court considered all four of the defense's Batson / Wheeler motions at length, ultimately denying them all. Appellants here challenge the trial court's determination *300 as to three of these four prospective jurors.[5]
In ruling on the motions before it, the trial court made certain findings applicable to all of the jurors in question. Preliminarily, it found that appellants had made out a prima facie case that the prosecutor had improperly exercised peremptory challenges based on race. Next, the trial judge detailed his own experiences as a lawyer and bench officer in the community, describing a career in Alameda County which included being a superior court judge for almost five years; a municipal court judge for over 27 years; and, before that, a lawyer with a criminal practice. Finally, with respect to numbers, one Black prospective juror was successfully challenged for cause by the defense, four Black jurors were peremptorily challenged by the prosecutor, one Black juror (Juror No. 2) was seated on the jury, and another Black juror was seated as an alternate. The trial court noted that the prosecutor had ample opportunity to challenge both Juror No. 2 and the Black alternate juror and declined to do so, a factor he found "powerful evidence" supporting the credibility of the prosecutor's proffered reasons for excusing jurors.
Before we turn to the individual circumstances of the three challenged prospective jurors here at issue, we note that the Attorney General, characterizing the trial court's detailed Batson / Wheeler analysis as "highly assiduous and serious," argues that the court's findings of no discriminatory intent are entitled to deference. Our own review of the extensive record leads us to a similar conclusion. Indeed, we would add to the Attorney General's observations that the trial court's consideration of these difficult questions was both astute and meticulous. Certainly, it constituted a "sincere and reasoned *872 attempt" to evaluate the prosecutor's decisionmaking in this case, and is therefore entitled to deferential review on appeal.[6] *301 B. Prospective Juror Pierre M.
On his jury questionnaire, Pierre M., a 30-year-old Black man, indicated that he believed the justice system was inherently flawed because the laws were manmade. When asked to explain his reasoning for challenging Pierre M., the prosecutor cited this belief. In addition, he pointed to a colloquy he had with Pierre M. during voir dire in which the prospective juror questioned the one witness rule. As the prosecutor elaborated: "[D]espite [Bennett's trial counsel] saying that there is physical evidence connecting the two crimes in this case, the BART shooting and the shooting at 89th and Hillside, the bottom line is that the case, the shooting on Hillside may well depend on evaluations of credibility. Certainly, the same gun was used, but in terms of the arguments that [defense counsel] is going to be making, he is going to suggest that either or both [Walton] and [Jordan] are lying about Mr. Bennett being the shooter, and that they should be disbelieved. And to break that down just a little bit more, specifically that [Jordan] was not telling the truth when he told his cousin that he was shot by the defendant. [¶] I can't have somebody on the jury-or certainly don't want somebody on the jury who has questions to a law with respect to whether one is sufficient for the proof of any fact."
*873 The trial court found both of the grounds articulated by the prosecutor to be valid and race-neutral reasons for excusing Pierre M. In addition, based on its "own independent recollection of the voir dire process," the trial court found credible the prosecutor's assertion that he had "excused all jurors who he felt there were some either inequalities in our criminal justice system or he had reservations about the effectiveness of the criminal justice system." In a similar vein, the trial court opined that, based on its observations, the prosecutor "also excused all jurors, regardless of race, who expressed a reluctance to apply the one witness rule."
As the trial court properly recognized, both the inability to follow the law and a belief that the criminal justice system is flawed are valid, race-neutral reasons for exercising a peremptory challenge. (See People v. Elliott (2012) 53 Cal.4th 535, 569-570, 137 Cal.Rptr.3d 59, 269 P.3d 494 [prospective juror's criticisms of the judicial system are permissible and race-neutral reason for peremptory challenge]; People v. Clark (2011) 52 Cal.4th 856, 907, 131 Cal.Rptr.3d 225, 261 P.3d 243 ["A prospective juror's distrust of the criminal justice system is a race-neutral basis for his excusal."]; People v. Howard (2008) 42 Cal.4th 1000, 1017, 71 Cal.Rptr.3d 264, 175 P.3d 13 [prospective juror's reluctance to follow the law valid basis for peremptory challenge].) Appellants nevertheless argue that the prosecutor's proffered reasons are not supported by the record and that similarly situated non-Black jurors were not excused. We disagree.
*302 With respect to the one witness rule, Pierre M. did initially tell the trial court generally that he had no problem with following the law as stated by the court. However, during another juror's voir dire, Pierre M. interjected, asking about the definition of "scientific evidence." The prosecutor stated that scientific evidence could include things such as fingerprints or DNA. In response, Pierre M. stated: "Given the case where you have, you have one person and you have maybe two witnesses that said 'I saw this person do that,' I think I would definitely have challenges with convicting a person based on one or two witnesses because those two witnesses could be in collaboration or anything . So I mean without any scientific evidence, I don't know what you categorize as scientific evidence, but without any solid evidence, it's not going to, you know, I can't convict someone based on he said/she said ." (Italics added.) Even after the prosecutor explained the one witness rule, Pierre M. maintained: "If the law was that one witness said that they saw someone do something, commit a crime, would that be sufficient evidence? I'd have a lot of trouble with that ." (Italics added.) The prosecutor then pointed out that at trial Pierre M. might find one witness compelling, or might not, and asked if that helped Pierre M. "to some extent?" Pierre M. replied "Yes." Appellants argue that, by the end of this colloquy with the prosecutor, Pierre M. had accepted the one witness rule. This is by no means *874 clear, however, and-given the magnitude of his difficulty with the concept-we accept the trial court's conclusion that the prosecutor provided a credible, race-neutral reason for challenging Pierre M.
As for Pierre M.'s statement that the justice system is inherently flawed because the laws are manmade, appellants claim that this was a religious-based assertion and that Pierre M. had otherwise reported that he held no religious beliefs that would interfere with his ability to serve as a juror. It was not unreasonable, however, for the prosecutor to credit Pierre M.'s specific statement over his more general one. Certainly, there is nothing in this record of sufficient concern to support rejection of the trial court's reasoned finding that the prosecutor's stated justification was genuine. In this regard, we reject appellants' claim of pretext based on the prosecutor's apparent failure to challenge four non-Black jurors with similar views. Preliminarily, we agree with the Attorney General that none of the views expressed by these other jurors appear as problematic as the concern articulated by Pierre M.[7] More fundamentally, however, appellants do not establish that any of these jurors also had significant problems with the one witness rule (or any other similarly serious disqualifying issue), and thus their attempt at comparative juror analysis fails at the outset. (See Hardy , supra , 5 Cal.5th at p. 77, 233 Cal.Rptr.3d 378, 418 P.3d 309 [compared jurors " 'must be materially similar in the respects significant to the prosecutor's stated basis for the challenge' "]; see also id. at p. 83, 233 Cal.Rptr.3d 378, 418 P.3d 309 ["[P]arties with limited peremptory challenges generally cannot excuse every potential juror who has any trait that is at all problematic. They must instead excuse those they believe will be most problematic under all the circumstances."].)
*303 C. Prospective Juror David L.
David L., a 60-year-old Black man, reported during voir dire that he had been "born deaf," was "hard of hearing," and used a combination of hearing aids and lip reading in order to understand others. David L. stated that he had made sure that he could hear everything said in the courtroom by sitting in the front. He claimed he had, in fact, heard everyone, except for a single prospective juror who had spoken softly and did not use the microphone. He did not see his hearing deficit as a problem. David L. further recounted that he previously sat on a jury in a criminal case that successfully reached a verdict. The prosecutor exercised a peremptory challenge to excuse David L. from the jury, and also argued to the court that the prospective juror's hearing issues might be grounds to excuse him for cause. The trial court disagreed, *875 indicating that David L. had expressed no problems hearing in court and finding it significant that he had been successful serving on a previous jury. Although the court stated that it was "not in any way diminishing [the prosecutor's] concerns," it felt the record was insufficient to support removal of David L. for cause.
After the trial court made this ruling, the prosecutor further explained his position as follows: "[M]y concern wasn't whether he'd be able to sit and listen to witnesses who took the stand and testified. I think there are ways that he could be accommodated in that. [¶] My real concern was over particular snippets of audio that the People would consider important in the case and not just important in the words that were said specifically by Miss Antilea Beal at the BART station shootings but sort of the inflection, the tone of her voice, how she said it in light of other things that were audible or said. And these were things ... that [David L.] would have to be able to hear without resorting to some of the tools that people who are hard of hearing often can resort to, which is moving themselves closer to a witness or sort of supplementing amplified hearing with an ability to read lips .... These would be words spoken by Miss Beal that are difficult to hear even on repeated hearing." The prosecutor further noted: "[I]t's not just my impression. The preliminary hearing magistrate, in a courtroom where we had the audio amplified, said he didn't hear what I indicated was audible on the tape. [¶] So I think it's a struggle to hear. And I think that's what left me of a mind that, despite [David L.'s] best effort, this would be an important piece of evidence that he may well not be able to hear no matter what kind of assistance we tried to provide him."
Thereafter, in ruling on the Batson / Wheeler motion with respect to David L., the trial court properly opined that a proffered excuse need not rise to the level of a challenge for cause so long as it is race-neutral. The court noted, however, that the prosecutor felt very strongly (though "entirely appropriately") about the cause challenge. It found that challenge important in the Batson / Wheeler context because it concluded that "it shows [the prosecutor's] good faith belief that [David L.] should not serve because he would not be able to hear and thus be able to be presented and receive testimony, critical evidence, which [the prosecutor] believes in good faith." On this basis, the trial court found the prosecutor's challenge of David L. to be both "totally race neutral" and genuine.
The record appears to corroborate the trial court's conclusion. However, appellants cite several arguments in support of their claim that the prosecutor's challenge of David L. due to his hearing issues was pretextual. Preliminarily, appellant's citation *304 to Crittenden v. Chappell (9th Cir. 2015) 804 F.3d 998, 1005, 1012 -for the proposition that making a meritless cause *876 challenge of a minority juror can evince discriminatory intent-is misplaced on these facts. This was not a situation where it was "well established" that the prosecutor's objection "did not warrant a for-cause challenge." ( Id. at p. 1005.) Rather, although the trial court ultimately concluded that the factual record was insufficient to support the cause challenge, it stated that its decision should not be viewed as "in any way diminishing [the prosecutor's] concerns" and it later characterized the prosecutor's beliefs underlying the cause challenge as strong, "entirely appropriate[ ]," and genuine.
In addition, while it is true that David L. stated, and the trial court subsequently found, that the prospective juror could hear "everything in the courtroom," that was not the impetus for the prosecutor's challenge. Rather, as detailed above, the prosecutor was concerned that David L. would not be able to discern words and tone on the audio recordings which he felt were central to the case. Moreover, while transcripts were available, it is reasonable to believe that the prosecutor wanted jurors to hear for themselves the inflammatory tone of Bennett and Beal shortly before the BART shooting. Further, as the Attorney General points out, there were disputes at trial regarding whether the transcripts were accurate. And, indeed, the trial court instructed the jury as follows: "Reasonable minds may differ at counsel table as to whether this transcript is totally accurate or not .... If there is any discrepancy in your mind as to what the words are that you hear on the audio portion of these recordings, any discrepancy between what you hear with your own ears and what you see on the page, you accept the words as you hear them as evidence that you may consider in this case." In addition, while appellants argue that the words on the tapes were not relevant, it was not unreasonable, on these facts, for the prosecutor to believe that the prosecution would be aided to the extent the jurors could discern for themselves the words spoken immediately before the shooting by the individuals involved in escalating the confrontation. And, the trial court found this belief to be genuine. ( Hardy , supra , 5 Cal.5th at p. 76, 233 Cal.Rptr.3d 378, 418 P.3d 309 ["The inquiry is focused on whether the proffered neutral reasons are subjectively genuine , not on how objectively reasonable they are. The reasons need only be sincere and nondiscriminatory."]; Lenix , supra , 44 Cal.4th at p. 613, 80 Cal.Rptr.3d 98, 187 P.3d 946 [reasonableness of prosecutor's explanation supports credibility finding].)
Finally, appellants' attempt at comparative juror analysis with respect to David L. is also unavailing. Specifically, appellants point out that Juror Nos. 4 and 7, neither of whom was Black, each indicated that they had hearing issues, but were not challenged by the prosecution. Juror No. 4, however, simply stated during voir dire that it was "a little difficult" the previous day to hear "some of the things because I have a cold and my ear was plugged but today has been fine." Obviously, temporary hearing loss due to illness is not comparable to David L.'s hearing issues. Similarly, Juror No. 7 commented during voir dire that, while he could hear the judge, he had *877 "[b]arely" been able to hear others during the morning session when there was no juror microphone. When asked whether he could hear other jurors that afternoon, after a microphone had been provided, Juror No. 7 responded: "Yes, pretty much." Again, there was no indication that this juror had a serious or systemic hearing issue. Thus, the treatment of these sitting jurors gives us no basis to question the *305 trial court's reasoned conclusion that the prosecutor challenged David L. based on a genuine belief that his hearing deficit would be problematic given the specifics of the evidence involved in this case.[8]
D. Prospective Juror Domanique J.
On his jury questionnaire, Domanique J.-a 22-year-old Black man who had recently moved to California-indicated that he held a bachelor of fine arts degree in dance and had attended a high school for the performing arts in New York City. Domanique J.'s questionnaire also disclosed that he had an aunt who had been arrested for "drug trafficking"; that he had visited her in jail; and that he, himself, had been arrested for public intoxication. Domanique J. was uninterested in reading material or video entertainment involving: "Criminal, court, Law & Order, News." And he stated that: "The Criminal Justice System works for the most part but there are cases where I feel the system has not worked."
During voir dire, the prosecutor asked Domanique J. more about his lack of interest in criminal justice-related entertainment, which elicited the following response: "I just, I don't find crime or anything dealing with the court interesting. I mean, if it was up to me, I would rather just not be here." With respect to his arrest for public intoxication, Domanique J. elaborated: "At the time, like the arrest, I guess you would say I didn't feel like I was treated fairly, but I definitely got off very easy. So-." When asked about his aunt's arrest, Domanique J. stated that she was convicted of trafficking drugs (marijuana) and spent four or five years in jail; he was close to her; he "was living there at the time," although he did not go to court with her; he visited her in jail three times; and, when she was released earlier that year, he spoke with her about her case. The prosecutor challenged Domanique J. immediately after he was questioned.
Later, when asked to explain his reasons for the challenge, the prosecutor highlighted the fact that Domanique J. questioned "whether the criminal *878 justice system works for the most part." The prosecutor also noted that "at a time when he was living with his mother, she was arrested and charged and convicted of drug trafficking." The prosecutor felt that "he was living with her at the time, and then the fact that he has visited her in prison, certainly suggests someone who might be prone to sympathy at the prospect of somebody going to prison for a crime."
As discussed above with respect to Pierre M., the trial court found that the prosecutor's challenge based on Domanique J.'s stated belief that the criminal justice system was flawed was legitimate and race-neutral. As for the prosecutor's other articulated reason for challenging Domanique J., the trial court opined, correctly, that "caselaw has repeatedly held that negative experience by the juror or a close relative of the juror [with the criminal justice system], that is a bona fide and genuine and race neutral reason to excuse the juror." (See, e.g., People v. Cruz (2008) 44 Cal.4th 636, 655, fn.3, 80 Cal.Rptr.3d 126, 187 P.3d 970 [citing cases]; Wheeler , 22 Cal.3d at p. 277, fn. 18, 148 Cal.Rptr. 890, 583 P.2d 748 [stating that a "personal *306 experience" with conviction and incarceration "suffered either by the juror or a close relative, has often been deemed to give rise to a significant potential for bias against the prosecution"].) The court noted that Domanique J. "indicated that his mother was arrested for drug trafficking, that he visited her in prison. He was living with her when she was convicted of this crime." Thereafter, the court went even further than the prosecutor on this point, stressing Domanique J.'s own experience with the criminal justice system: "[H]e, himself, had a contact with the criminal justice system, that he had a negative experience with that. He felt that he was not treated fairly, although he seems to admit and acknowledge that what he was arrested for was public intoxication, and he served a very lenient sentence, even by his own standards, which he admitted. But, nevertheless, he harbors the feeling which he expressed here in court, that his experience was a negative one. He doesn't feel that he was fairly treated by the criminal justice system."
On appeal, appellants make much of the fact that both the court and the prosecutor got certain facts wrong during discussion of the Batson / Wheeler motion involving Domanique J. Specifically, appellants point out that was Domanique J.'s aunt, not his mother, who was arrested; claim that he was not living with his aunt at the time; and stress that, contrary to the prosecutor's justification, Domanique stated that the criminal justice system does "work for the most part." However, "[w]hile a prosecutor's credibility may be questioned if the prosecutor 'mischaracterizes a juror's testimony in a manner completely contrary to the juror's stated beliefs,' a prosecutor's 'mistake in good faith, such as an innocent transposition of juror information,' does not support a finding that the prosecutor is not credible." ( Sifuentes v. Brazelton (9th Cir. 2016) 815 F.3d 490, 512 ; see also People v. O'Malley (2016) 62 Cal.4th 944, 980, 199 Cal.Rptr.3d 1, 365 P.3d 790 *879 ["prosecutor's mistaken reference ... alone does not establish that the prosecutor's stated reasons were pretexts for discrimination"]; People v. Williams (2013) 56 Cal.4th 630, 661, 156 Cal.Rptr.3d 214, 299 P.3d 1185 [no Batson / Wheeler violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason]; People v. Williams (1997) 16 Cal.4th 153, 189, 66 Cal.Rptr.2d 123, 940 P.2d 710 ["a genuine 'mistake' is a race-neutral reason"].)
Here, while misstatements were certainly made, we do not find them significant. As such, they do not supply a basis for finding the prosecutor not credible. For example, it is true that Domanique J. did not, as the prosecutor stated, question "whether the criminal justice system works for the most part." Rather, he said: "The Criminal Justice System works for the most part but there are cases where I feel the system has not worked." Thus, while he misspoke, the prosecutor was correct in his belief that Domanique J. felt that the system sometimes does not work. And, as stated above, the trial court found this proffered justification (flawed criminal justice system) to be credible and race-neutral. Similarly, with respect to the incarcerated relative, it was clearly Domanique J.'s aunt rather than his mother. Moreover, when asked whether they were close, Domanique J. stated: "Yes. I was living there at the time, I didn't go [to] the court, but I was around her, the relatives when it was going on." While this was perhaps ambiguous as to whether the prospective juror lived in the same house or just in the same geographic area as his aunt, at bottom, the record supports that Domanique J. had a close relative; that he was around her while she went through the court process; that she was incarcerated *307 for a significant period on drug trafficking charges; and that he visited her multiple times during her incarceration. The trial court found this a valid and race-neutral reason to challenge Domanique J. and we see no error in this regard, despite the minor misstatements that were made.
Finally, we reject again appellants' attempt to marshal comparable jurors, here arguably to show that they had experiences with incarceration similar to Domanique J., but were not challenged by the prosecutor. Juror No. 3's questionnaire disclosed that, 30 years ago, the juror had visited an inmate at Vacaville Prison. The individual apparently was not a relative or close friend. Juror No. 12 indicated that "years ago" she picked up her brother at the Santa Rita Jail after he had been arrested on a domestic violence charge for which he was never prosecuted. And Juror No. 12 stated that he worked as a counselor at a correctional facility for six months during graduate school. Obviously, none of these experiences compares with visiting a close relative convicted of a serious crime on multiple occasions while she was incarcerated. Appellants also suggest the same comparable jurors on the issue of the fairness of the criminal justice system that they advanced in their challenge to Pierre M. But this attempt fails here for the same reason: None of those jurors had any other serious disqualifying issue, such as Domanique J.'s experiences *880 regarding his aunt's incarceration or Pierre M.'s problems with the one witness rule. Thus, they were not similarly situated.[9]
In sum, the trial court here considered at length the prosecutor's reasons for challenging each of the three prospective jurors discussed above, concluded that all of the proffered reasons were valid and race-neutral, and expressly found the prosecutor credible and his justifications genuine. We see no Batson / Wheeler error on this record, and certainly no abuse of discretion.
III.-IV.**
V. DISPOSITION
Bennett and Smith's convictions are affirmed, but Bennett's case is remanded for the trial court to exercise its discretion with respect to possible resentencing.
We concur:
Streeter, Acting P.J.
Tucher, J.

Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. and IV.

After their introduction, we generally refer to the individuals involved in these proceedings by their last names. However, individuals with the last name Smith-other than co-defendant Smith-will be referred to by their first names for purposes of clarity.

All statutory references are to the Penal Code unless otherwise specified.

Since Smith was a juvenile when he committed the underlying offense for this charge, the information was later amended to reflect a violation of section 29820, subdivision (b): possession of a firearm by a person who committed an enumerated offense which resulted in a juvenile court wardship.

This claim of error was initially raised by Bennett on appeal, but Smith has since joined in Bennett's arguments as permitted by rule 8.200(a)(5).

The fourth juror challenged below, Doris P., had a son who was serving a prison sentence after a conviction for voluntary manslaughter. Doris P. thought the verdict was "a little harsh" and stated that the fairness of the criminal justice system is sometimes questionable. The prosecutor defended his use of a peremptory challenge in this context, stating: "I can't imagine a DA in this county that would leave a mother of a son convicted of manslaughter, doing time in prison, on their jury." The trial court, citing numerous cases, agreed that it is "entirely reasonable" and race-neutral to excuse a juror whose close relative has had a serious and negative experience with the criminal justice system. Appellants do not question this conclusion.

In reaching this conclusion, we reject appellants' suggestion that de novo review is appropriate on this record because the trial court applied an improper legal standard in denying their Batson / Wheeler claims. Specifically, appellants argue that the trial court incorrectly relied on the fact that the prosecutor left one Black juror on the jury to find no evidence of racial discrimination in this case. It is true that the fact that the prosecutor "passed" or accepted a jury containing a Black juror is not the end of our inquiry. (People v. Snow (1987) 44 Cal.3d 216, 225, 242 Cal.Rptr. 477, 746 P.2d 452 (Snow ).) Such a rule "would provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion." (Ibid. ) However, our high court has repeatedly held that "[w]hile the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider." (People v. Turner (1994) 8 Cal.4th 137, 168, 32 Cal.Rptr.2d 762, 878 P.2d 521 ; see also People v. Gutierrez (2017) 2 Cal.5th 1150, 1170-1171, 218 Cal.Rptr.3d 289, 395 P.3d 186 ; People v. Blacksher (2011) 52 Cal.4th 769, 802, 130 Cal.Rptr.3d 191, 259 P.3d 370 ; Lenix , supra , 44 Cal.4th at p. 629, 80 Cal.Rptr.3d 98, 187 P.3d 946 ; People v. Cornwell (2005) 37 Cal.4th 50, 70, 33 Cal.Rptr.3d 1, 117 P.3d 622, disapproved on other grounds as stated in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22, 87 Cal.Rptr.3d 209, 198 P.3d 11 ; Snow , at p. 225, 242 Cal.Rptr. 477, 746 P.2d 452.) That is exactly what the trial court did here. Among many other factors, it concluded that the retention of one Black juror and one Black alternate supported a finding that the prosecutor's race-neutral reasons for his peremptory challenges were credible. We see no legal error. However, even were we to conclude that the trial court improperly inflated the importance of this factor by finding it "powerful evidence" of the prosecutor's lack of discriminatory intent-and even were we to assume that this amounted to legal error sufficient to vitiate our otherwise deferential review of the trial court's Batson / Wheeler conclusions-we would reach the same result under a de novo standard of review.

For example, Bennett argues that Juror No. 1 was similar because she stated that the criminal justice system was "imperfect." However, what this juror actually said was that the criminal justice system was "[i]mperfect but way ahead of most countries in the world. Grateful for it after working in DR Congo with no criminal justice system." Thus, overall, this juror actually felt positively about the system.

We decline to address Bennett's argument, made for the first time in his reply brief, that the dismissal of David L. violated the prospective juror's civil rights as a disabled person. (See People v. Mickel (2016) 2 Cal.5th 181, 197, 211 Cal.Rptr.3d 601, 385 P.3d 796 ["Ordinarily, we do not consider arguments raised for the first time in a reply brief."].) We note only that the prosecutor's reason for utilizing the peremptory challenge was race-neutral and that David L.'s rights are not at issue in these proceedings.

Indeed, the record supplies additional reasons to conclude that Domanique J. was not similarly situated to these other jurors because, in addition to the two reasons for the challenge advanced by the prosecutor, Domanique J. had also, himself, been convicted of a crime, as the trial court noted. Further, Domanique J. appears to have also had issues with the one witness rule and he expressed a lack of interest in the criminal justice system and a desire not to serve as a juror. Thus, there were many race-neutral reasons why his inclusion on the jury might have been troubling to the prosecutor.

See footnote *, ante .