Filed 9/27/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>GARY TIMOTHY BRYANT, JR., et al.,<br><br>      Defendants and Appellants. | A152029<br><br>(Contra Costa County<br>Super. Ct. No. 05-152003-0) |

Defendants Gary Timothy Bryant, Jr., and Diallo Ray Jackson appeal their convictions for first degree murder, shooting at an occupied vehicle, being felons in possession of firearms, and, as to Bryant, assault with a semiautomatic firearm. Bryant seeks reversal of his murder conviction under Senate Bill No. 1437 (2017–2018 Reg. Sess.), which amended the felony murder rule and the natural and probable consequences doctrine as it relates to murder. Defendants also argue the verdicts must be overturned based on alleged errors in jury selection, their sentences for firearm enhancements must be modified in accordance with the pleadings and findings of the jury, and remand is required to allow the trial court to exercise its discretion whether to strike their firearm enhancements under Senate Bill No. 620 (2017–2018 Reg. Sess.). We agree defendants' current 25-year-to-life sentences for the firearm enhancements are unauthorized and the case must be remanded to allow the trial court to exercise its discretion whether to strike the firearm enhancements. The judgments are otherwise affirmed as to both defendants.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., C. and D.

# I. BACKGROUND

## A. *Facts*

We provide only a brief summary of the facts underlying defendants' convictions, because they are generally not necessary to our decision. We provide further background on relevant proceedings in the trial court in our discussion of defendants' legal arguments.

William B. testified as a prosecution witness to the following facts: On July 8, 2014, Kenneth Cooper drove his car into the parking lot at Delta View Apartments in Antioch, California. F.H. got in the front passenger seat of Cooper's car, and William B., F.H.'s brother, and G.P. all got in the backseat of Cooper's car. About a minute later, two people approached Cooper's car, one on the driver's side and one on the passenger's side. William B. had seen both men about an hour earlier by the laundry room of the Delta View complex. William B. recognized one of the men, who approached the driver's side of Cooper's car, from having seen him twice before at the Delta View Apartments. William B. had trouble recognizing that person as Jackson in court, saying he looked "like his son," but had identified him previously from a photo lineup, telling police, " 'That's a face I can't really forget about.' " William B. identified Bryant as the man who approached on the passenger's side where F.H. sat. As Bryant walked up, Cooper grabbed a nine-millimeter gun from the driver's door, cocked it so it was ready to fire, and stowed it under his shirt.

F.H. stepped out of the car. William B. saw Bryant hit F.H. and saw F.H. fall. As soon as F.H. was on the ground, Bryant asked Cooper, " 'What [are] you reaching for?' " Cooper pulled out his gun and both he and Bryant started shooting. William B. saw the second person who had approached Cooper's car point a gun, but did not see him shoot. William B. heard about eight shots. The driver-side and passenger-side windows shattered and glass flew into the car. Cooper drove off with the car door open, made a U-turn, and tried to drive away. Seeing they were about to crash, William B. reached over from the backseat to the driver's seat in an attempt to steer the vehicle, but it crashed into

another car.  After they crashed, William B. got out of the vehicle and checked on Cooper who was shaking and nonresponsive.  Cooper died from one of his gunshot wounds.

An expert in forensic pathology testified at trial that the direction of the fatal injury to Cooper's abdomen was consistent with a gun having been fired from the left side of his body.

## B. *Procedural Background*

The Contra Costa County District Attorney charged defendants with murder (Pen. Code,[1] § 187, subd. (a); count 1), discharging a firearm at an occupied vehicle (§ 246; count 3), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4 [Bryant], count 5 [Jackson]).  Bryant was charged with assault with a semiautomatic firearm. (§ 245, subd. (b); count 2.)  The information further alleged counts 1 through 3 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), a principal personally used a firearm in counts 1 and 3 (§ 12022.53, subds. (b) & (e)(1)), and Bryant had previously served a prison term (§ 667.5).  During trial, the trial court granted the prosecutor's motion to amend the information to add a firearm-use allegation under section 12022.53, subdivision (c) to count 1.

The jury found defendants guilty on all counts and found all special allegations true.  The jury found the murder was first degree murder.

The trial court sentenced Bryant to 53 years to life in prison, and Jackson to 50 years to life in prison.  Both defendants filed timely notices of appeal.

## II.  DISCUSSION

## A. *Relief Under Senate Bill 1437*

At trial, the prosecution argued Bryant was guilty of murder under an aiding and abetting theory.  Though the trial court provided instructions on aiding and abetting murder directly with the intent to kill and on aiding and abetting an underlying felony (attempted robbery) where a codefendant inflicts a fatal wound, the prosecution's closing argument focused on the theory of aiding and abetting a felony which resulted in death.

---

[1] All statutory references are to the Penal Code.

The jury's verdict found Bryant guilty "of the crime of first degree murder, a violation of Penal Code section 187(a) (FELONY MURDER) . . . ." The jurors did not make any finding that Bryant acted with the intent to kill or reckless indifference to human life. Bryant now argues his murder conviction must be reversed because it was based on a theory of felony murder culpability that no longer exists under state law.

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Substantively, the bill redefined "malice" for the crime of murder by amending section 188, which now provides: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) It also amended section 189, defining the degrees of murder, to provide that a participant in an enumerated felony in which a death occurs is only liable for murder where the participant was the actual killer, acted with intent to kill, or was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subd. (e).) Further, the bill added section 1170.95, which permits those convicted of felony murder (or murder under a natural and probable consequences theory) to file a petition with the sentencing court to vacate the conviction and be resentenced. (§ 1170.95, subd. (a); see *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147 (*Anthony*); *People v. Martinez* (2019) 31 Cal.App.5th 719, 722 (*Martinez*).)

Bryant contends that because Senate Bill 1437 went into effect before his appeal was final, he is entitled to reversal of his murder conviction based on the retroactive application of the changes to the law under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). The Attorney General does not dispute Senate Bill 1437 applies retroactively, but argues Bryant must seek relief through section 1170.95's petition process in the trial court, and not through this direct appeal.

4

We conclude the enactment of Senate Bill 1437 does not empower us to vacate Bryant's murder conviction; rather, Senate Bill 1437 mandates a remand to the trial court to allow defendants to file a petition for relief under section 1170.95, subdivision (a)(3). Where, as here, our Legislature has created a special statutory remedy for defendants to use in availing themselves of a retroactive change in the law, that procedure must be followed, and—notwithstanding *Estrada*—relief will not be granted on direct appeal of a conviction that is valid under the prior law. (*People v. DeHoyos* (2018) 4 Cal.5th 594, 603 (*DeHoyos*); *People v. Conley* (2016) 63 Cal.4th 646, 652 (*Conley*).) Our appellate courts have consistently applied this principle to Senate Bill 1437. (*Martinez, supra,* 31 Cal.App.5th at pp. 727–729; *Anthony, supra,* 32 Cal.App.5th at pp. 1153–1158.)

Bryant argues *Conley* and *DeHoyos* are distinguishable because in those cases, the new statutory remedies imposed additional substantive criteria for relief, requiring the trial courts in those cases to find the defendants would not " 'pose an unreasonable risk of danger to public safety' " if released. But as the *Martinez* court explained, "While defendant is correct that section 1170.95 does not require a dangerousness inquiry, neither *Conley* nor *DeHoyos* holds that inquiry was the indispensable statutory feature on which the result in those cases turned. . . . [W]e look not for specific procedural conditions, but for indicia of the Legislature's intent. Here, . . . the other indications the Legislature intended to restrict individuals who have already been convicted to the petitioning procedure outlined in section 1170.95 are considerable." (*Martinez, supra,* 31 Cal.App.5th at p. 728.) Moreover, Senate Bill 1437 creates a petition procedure that provides an opportunity for the parties to present new and additional evidence, and requires a trial court to determine whether Bryant qualifies for relief. (§ 1170.95, subd. (d)(1), (3).) Thus, like the statutes at issue in *Conley* and *DeHoyos,* section 1170.95 calls for the development of further facts, a task to which trial courts are suited and appellate courts are not.

We likewise reject Bryant's argument that a determination the petition procedure is his exclusive remedy violates his constitutional right to a jury trial under the Sixth Amendment by denying him the right to have factual determinations about his liability

5

made by a jury rather than a sentencing court.  The legislative changes afforded by Senate Bill 1437 "constitute[] an act of lenity that does not implicate [Bryant's] Sixth Amendment rights."  (*Anthony, supra,* 32 Cal.App.5th at pp. 1156–1157, citing *People v. Perez* (2018) 4 Cal.5th 1055, 1063–1064.)  Bryant's attempt to distinguish *Perez* on the ground that Senate Bill 1437 redefines the elements of "murder" is unpersuasive.  Because Senate Bill 1437, like Proposition 36 at issue in *Perez,* operates as a retroactively ameliorative statute as to defendants like Bryant, it does not implicate his constitutional right to a jury trial.

We affirm Bryant's murder conviction, but do so without prejudice to his filing a section 1170.95 petition in the trial court once his appeal is final.  It is for the trial court to determine in the first instance whether Bryant qualifies for relief, and we express no opinion on the merits of such a petition.

**B.  *Jury Selection***

Defendants both contend reversal of their convictions is required because the trial court erred in denying three defense motions challenging the prosecution's use of peremptory strikes to remove four African-American jurors in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).[2]  It is undisputed both defendants are African-American, as were all four of the challenged jurors.[3]

Although a prosecutor may exercise a peremptory challenge to strike a prospective juror " 'for any reason, or no reason at all' " (*People v. Scott* (2015) 61 Cal.4th 363, 387 (*Scott*)), he or she may not use a peremptory challenge to " 'strike prospective jurors on

---

[2] Jackson's opening brief indicates he joins Bryant's argument.

[3] Two African-American jurors were excused for cause.  The first, K.B., said she believed the judicial system was corrupt, most of the laws need to be examined or done away with, and the United States was imprisoning Black men and other minorities to continue free labor.  When questioned about her cousin's arrest at age 13 and whether that experience would make it hard for her to treat both sides fairly, she said: "Yes.  I'm very suspicious of the whole court system."  The second, J.H., said she might know one of the defendants.  Neither of those rulings are challenged on appeal.

the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds . . . ." ' " (*People v. Bell* (2007) 40 Cal.4th 582, 596 (*Bell*), disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13).  Doing so violates a defendant's federal right to equal protection set forth in *Batson, supra,* 476 U.S. at pages 88 to 89 and his or her state right to a trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution set forth in *Wheeler, supra,* 22 Cal.3d at pages 276 to 277.  (Accord, *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157.)  As our Supreme Court explained in *Scott*, "The *Batson/Wheeler* framework is designed to enforce the constitutional prohibition on exclusion of persons from jury service on account of their membership in a cognizable group.  It is also designed to otherwise preserve the historical privilege of peremptory challenges free of judicial control, which 'traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury.' " (*Scott*, at p. 387.)

A defendant bears the ultimate burden of showing a constitutional violation (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 (*Lenix*)), but courts employ a three-step, burden-shifting mechanism in assessing whether a *Batson/Wheeler* violation has occurred.  The defendant must first "make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges." (*Scott*, *supra*, 61 Cal.4th at p. 383.)  If the trial court finds the defendant has established this prima facie case, the prosecutor must then "explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications." (*Ibid.*)  Lastly, the court must make a " 'sincere and reasoned effort to evaluate the nondiscriminatory justifications' " (*People v. Williams* (2013) 56 Cal.4th 630, 650) and "decide whether" the prosecutor's proffered reasons are subjectively genuine or instead a pretext for discrimination (*Scott*, at p. 383; *People v. Duff* (2014) 58 Cal.4th 527, 548).

7

## 1. Background Facts

*Prospective Jurors O.H. and T.M.—Motion No. 1*

Before voir dire, prospective jurors filled out questionnaires that included basic demographic information and asked about a number of issues, including experience with crime and attitudes towards guns, gangs, and police witnesses. Jurors were asked about their experiences with police and whether they, a family member, or anyone close to them, had ever been convicted of a crime.

During voir dire, Prospective Juror O.H. was asked about her comment that she had a nephew who had an interaction with police about two years before that she felt was unfair. O.H. stated her nephew spent the night in jail but was released and did not face charges. O.H. thought she would be a fair and unbiased juror.

Another prospective juror, T.M., was questioned both outside the presence of other jurors and in front of the entire panel about his responses to the jury questionnaire. Privately, the prosecution asked about his opinion that " 'all lawyers are con artists.' " T.M. said that was his impression based on "conversations [he] had with others and other lawyers" to whom he had talked. He had also responded "yes" to a question asking whether he had any strong opinions about how police do their jobs, and he wrote on his questionnaire: "Minorities aren't treated fairly in any county in California." When asked about those statements privately, T.M. affirmed he tended to be distrustful of police and said it was because he had been pulled over three times in Union City. In front of the jury panel, T.M. indicated he had once been stopped by the police because his truck was two inches too high, and he felt the police officer pulling him over was being dishonest. T.M. affirmed that his personal experience of being pulled over contributed to his opinion minorities were not treated fairly. Nonetheless, T.M. did not think he would be biased against the police because he had also had "experiences with officers that have been very helpful and have supported [him] in certain circumstances that pertain to [his] home." As far as his opinion of the criminal justice system as a whole, he said his opinion was "based off what I hear through the media."

After the jurors had been passed for cause, the prosecutor told the court he intended to excuse both O.H. and T.M. because they "had negative experiences with law enforcement." As to O.H., she "had a nephew who was treated unfairly in a DUI case two years ago, and it affected her." The prosecutor added that O.H. had a daughter who had interned with the American Civil Liberties Union (ACLU), a "typically very liberal organization," O.H. was "unemployed which causes me some concern," and she had "worked previously for a nonprofit corporation, which . . . [is] typically not a pro-law enforcement type of occupation." As to T.M., he "was pulled over by the police, [and the] police lied . . . to him about being pulled over. And he also expressed an opinion that minorities aren't treated fair in any county in California." The prosecutor then added, "I don't [know] if defense counsel was going to exercise a *Wheeler* challenge for [O.H.] and [T.M.], who in my opinion are both African-American. . . . [¶] But I wanted to state that on the record so we can make use of our time."

The court asked counsel for both defendants if they wanted to exercise *Batson/Wheeler* challenges and both said "Yes." The court then ruled: "I am not finding that a prima facie case has been made as to either one of the jurors, [O.H.] and [T.M.]. I will confirm that the People's observation of them is that they are both African-American. I would not have found a cause challenge as to them because they did hew to the premise that they would comply with the law. . . . However, both [O.H.] and [T.M.] had strong negative experiences with family members connected with the police. And so I'm not finding that a prima facie case of bias has been established. Therefore I will not go to the next level of any comparative analysis or anything else."

After the court's statements, defense counsel asked for "an opportunity to make [the *Batson/Wheeler*] challenge— [¶] . . . [¶] . . . before it's summarily denied." Counsel for Bryant then stated he was making a *Batson/Wheeler* challenge and argued that "of the approximate 100 jurors who remain in the panel after hardships, there are five African-Americans. The peremptory challenge by the People against both [O.H.] and [T.M.] represents two out of the five African-American jurors in the room." Bryant's counsel also noted O.H. did not say anything about her personal opinions about her daughter's

9

employment at the ACLU, and "did not express any ill-will towards police with respect to the family member who had the DUI incident, . . . [who] more importantly . . . was never charged by the prosecutor." Counsel for Jackson added that when talking to T.M. in private, he "expressed a fairness that . . . goes beyond reproach in this day and age as to what he said. I mean, when I get a traffic stop, it may not be based on race, but certainly if you're a black person, that's the first thing you're going to think and that's the first thing you're going to say, especially if it's a haywire kind of a stop." Jackson's counsel opined there was nothing in that "human experience to make him less [*sic*] of a biased witness that should be subject to being taken off this jury by the prosecutor's situation here. I think it's purely a game of trying to get all the blacks off you can because the case is a disparate case of confusion and he wants to keep it that way without the human experience of what a black person goes through in this society." Counsel said it would be "objectionable under the basic law and the Constitution to take these . . . necessary jurors off this jury pool with the fact of the limited amount of representation in our jury pool."

The court then noted that "numerous cases have held that a prosecutor is entitled to dismiss a juror who has had negative contacts with law enforcement, the criminal justice system, or who have close relatives who have had negative contacts notwithstanding the juror's assurances that the prior experiences would not impact the juror." In support, the court cited *People v. Avila* (2006) 38 Cal.4th 491, *People v. Farnam* (2002) 28 Cal.4th 107, and *People v. Adanandus* (2007) 157 Cal.App.4th 496, 505. The court concluded, "I am finding the People to be credible, and so the *Batson-Wheeler* motion is denied."

*Prospective Juror C.A.—Motion No. 2*

During voir dire, Prospective Juror C.A., was questioned by the court. He stated he had been a real estate editor for a local newspaper for the past 15 years. C.A. had served on two juries before, one of which did not reach a verdict. C.A. agreed that he had written on his questionnaire that the majority of police are excellent, but too many abuse their authority, especially involving Black suspects, but told the court he did not think

10

that attitude was going to "affect [him] at all" in jury deliberations. When questioned by the prosecutor about whether he would accept the testimony of only a single witness, C.A. responded he "would prefer to have many or several other witnesses because I've seen too many instances in documentaries where different people see the same thing from different perspectives." C.A. said he was "not saying that [he] wouldn't accept one witness," only that "it would be best if there were other witnesses who may have different perspectives on it." When pressed by the prosecutor, C.A. then said he would "attempt" to follow the law, he "would think that more than one witness is best even though [he] would follow the law," and eventually that he "would go along with the witness if I believe it strongly."

When the prosecution later sought to excuse C.A., Bryant's counsel made a *Batson/Wheeler* motion. "As I noted before with respect to demographics," he said, "there's now three African-Americans left in the jury pool in this case. So the striking of [C.A.] would reduce the total number in the panel to two, all the way up through Juror 300." Bryant's counsel noted C.A. had served as a juror twice before, had a "significant relationship with law enforcement," and asserted "we're now seeing a very clear pattern of systemic exclusion of African-Americans from this jury." Counsel explained further: "I would note that the prior justification from the prosecution that two black jurors both had negative experiences with law enforcement. I think that that reasoning is a pretext for race given the realities of the experiences of black people in our society, historical discrimination, and very clear statistics of disparate treatment of African-Americans by police, by the justice system. So African-American jurors are more likely to have had experiences with police, have family members who have had bad experiences with police, and I think what we're seeing is a troubling pattern." Counsel for Jackson joined the motion.

The trial court "found specific race-neutral justifications" for the excusal and did not "find a prima facie case was made." The trial court then invited the prosecution to make a record. The prosecution offered several reasons, "not in order of relevance," for its challenge, including (1) C.A. was a retired journalist, "typically . . . not a good

11

occupation for district attorneys, much like teachers"; (2) his spouse was a teacher; (3) although he had been on two juries before, one "hung," and C.A. "clearly indicated that he was inclined to be one of the jurors that was voting for a not guilty verdict"; (4) his opinion about police officers was that the "majority are excellent, but he also stated that too many abuse their authority, especially involving black suspects"; and (5) when the prosecutor asked the jury as a group if they had any concerns with the testimony of a single witness, C.A. was one of two jurors who expressed concerns.

After the prosecution gave its reasons, the trial court reiterated that it had "stopped at the first level and permitted the People just to make the record." The court said it "did not ask for a race-neutral justification because I saw one, which was cited by the People, it was quite loud." The court denied the motion.

### *Prospective Juror V.N.—Motion No. 3*

V.N. was a prospective alternate juror. She was initially questioned privately about an experience her son had with the criminal justice system. V.N. explained her 27-year-old son had been arrested two years before by the Pittsburg police and was currently incarcerated. V.N. was "[n]ot as close as [she] would like to be" to her son, and did not know much about his case. She believed the crime may have been pandering or shoplifting, but she was not sure. She thought her son was sentenced to nine years in prison, though she believed he would be serving four to six years because of good behavior. Asked if he was treated fairly, V.N. responded, "It's hard when you say fair because I don't know what to compare it to." V.N. said her experience would not make her biased against the prosecution. V.N. also explained she was employed as an environmental protection specialist for the federal government.

Bryant's counsel brought his third *Batson/Wheeler* motion as to V.N., arguing she was the only remaining African-American juror in the pool following the selection of a jury with no African-Americans, the prosecution had excused all four potential African-American jurors who had been called after hardship and for cause challenges, and V.N. was an educated person with no particular feelings about her son's case.

12

The court invited the prosecution to respond "before the Court made a comment about the first level of the *Batson-Wheeler* challenge." The prosecutor said he excused V.N. because (1) her son had been arrested by the Pittsburg Police Department, one of the agencies on his witness list; (2) her son was approximately the same age as defendants; (3) her occupation as an environmental protection specialist "obviously [had] a strong liberal slant, pro-environment," and those people tended not be a good jurors for the prosecution; and (4) her spouse worked for the postal service and the prosecutor previously had two trials end with a hung jury based on postal workers.

The court observed the defense has the "burden to make a prima facie case showing that the totality of the relevant facts gives rise to the inference of a discriminatory purpose." The court then ruled, "I do appreciate the fact that there were in the jury pool [*sic*] that were not challenged for cause four persons of African-American descent, and I do appreciate the fact that the defendants are African-American. However, I am finding that there is a neutral race-based reason provided by the prosecutor, and I find him to be credible." The court cited cases upholding the dismissal of jurors whose close relatives had been arrested, prosecuted, or convicted of a crime, as well as cases approving dismissal of jurors based on their occupation, including postal workers. The court concluded: "I did not find that the burden shifted to the People. I think they've made their comments, but the prima facie case was not established. I saw abundant reason to dismiss [V.N.]. So I'm granting the strike and denying the *Batson* motion." The court noted the seated jury was not all Caucasian, but agreed with the defense it included no African-Americans.

### 2. First-stage/Third-stage Review

As an initial matter, the parties disagree whether the trial court's rulings on the three *Batson*/*Wheeler* motions should be evaluated at the first stage (prima facie case) or third stage (ultimate question of discrimination).

In *Scott,* the California Supreme Court clarified the review procedure "when the trial court, having determined that no prima facie case was established and having heard the proffered justifications, goes ahead and makes an *alternative* holding that those

13

reasons were genuine." (*Scott, supra,* 61 Cal.4th at p. 386, italics added**.)** **"[W]**here (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling.  [Citations.] . . . If the appellate court agrees with the trial court's first-stage ruling, the claim is resolved.  If the appellate court disagrees, it can proceed directly to review of the third-stage ruling . . . ." (*Scott,* at p. 391, fn. omitted*.*)

On the other hand, where the court finds no prima facie case, but does so only *after* the prosecutor has stated his or her reasons for the challenges, " 'we infer an "implied prima facie finding" of discrimination and proceed directly to review of the ultimate question of purposeful discrimination.' " (*People v. Hardy* (2018) 5 Cal.5th 56, 76 (*Hardy*), quoting *Scott, supra,* 61 Cal.4th at p. 387, fn. 1.)  Here, as to the motion challenging O.H. and T.M., motion No. 1, the prosecutor offered his reasons before the trial court had an opportunity to determine whether a prima facie case had been established.  And as to motion No. 3, concerning V.N., the trial court invited the prosecutor to give his reasons and found them credible before deciding whether a prima facie case had been established.  Accordingly, as to motions Nos. 1 and 3, we begin with a third-stage review.

The second motion as to C.A., however, was clearly decided at the first stage.  On that motion, the trial court first determined no prima facie case had been established, then invited the prosecution to make a record of his reasons for excusal.  As defendants concede, this is a first-stage ruling.  Citing *People v. Riccardi* (2012) 54 Cal.4th 758, 786–787*,* and *Scott, supra,* 61 Cal.4th at page 392, defendants nonetheless urge us to review this motion as a third-stage inquiry, because the trial court considered the prosecution's reasons when ruling on the first and third motions, and to not do the same with regard to C.A. would be "entirely artificial."  We also acknowledge the prosecutor's

use of peremptory challenges in this case may warrant closer scrutiny because "although the numbers are small, [he] excused every African-American prospective juror [he] could have excused." (*Hardy, supra,* 5 Cal.5th at p. 78.) Accordingly, we will evaluate the prosecutor's reasons for excusing all four prospective jurors. As we explain below, however, whether we review the second motion at the first stage or the third stage, we find the trial court did not err.

### 3. Analysis

#### *O.H. and T.M.*

The prosecutor claimed he dismissed O.H. because she had negative experiences with law enforcement—specifically because she had a nephew she felt was treated unfairly in a DUI case—and because both she and her daughter had worked for organizations he felt were "typically" liberal or not "pro-law enforcement." The prosecutor excused T.M. because he also had negative experiences with law enforcement, and held a view that minorities are not treated fairly in any county in California. These are accepted race-neutral reasons to exclude jurors. (See *People v. Reed* (2018) 4 Cal.5th 989, 1001 (*Reed*) [relative's negative experiences with law enforcement is valid basis for peremptory challenge]; *People v. Lomax* (2010) 49 Cal.4th 530, 573 [arrest of close relative is race-neutral reason to exclude juror]; *People v. Chism* (2014) 58 Cal.4th 1266, 1317 [prosecutor can challenge juror based on occupation].)

Defendants contend the trial court's ruling nonetheless requires reversal because the prosecutor's reasons applied equally to seated jurors and his proffered reasons were pretextual. As to O.H., Bryant contends the prosecutor's statement that O.H. was "affected" by her nephew's experience is unsupported by the record because she said her nephew's experience would not make her biased toward the defense. But O.H. apparently wrote on her juror questionnaire that she felt her nephew was treated unfairly. Based on that statement, the prosecutor could reasonably deduce she was "affected" by his experience with the criminal justice system. (See *People v. Jones* (2013) 57 Cal.4th 899, 920 [" '[A] prosecutor may reasonably surmise that a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to

the prosecution.' "].)  Moreover, whether O.H. was "affected" by her nephew's experience and whether *she* felt she could be a fair and unbiased juror are two different things.  And in any event, whether O.H. could be fair is irrelevant, because we are addressing peremptory challenges, not challenges for cause.  (*People v. Mills* (2010) 48 Cal.4th 158, 176 [justification for peremptory challenge need not support challenge for cause].)

Defendants also argue the prosecutor's concern about the prior arrests of prospective jurors or their relatives was selective because three other jurors, none of whom were African-American, had themselves been charged or had a close relative who was charged with a DUI.[4]  Significantly, however, all three of those jurors, unlike O.H. and T.M., felt they or their loved ones had been treated fairly.[5]

Defendants also question the prosecutor's decision not to question O.H. about topics that were allegedly critical to the decision to discharge her—her prior employment and her daughter's employment.  But the court gave the parties limited time to question the jurors and it was reasonable for the prosecutor to focus on questions about O.H.'s nephew, which would likely give greater insight into her opinions most pertinent to the case at hand.[6]  Moreover, as our Supreme Court has held, when attorneys receive jurors' questionnaires prior to commencement of voir dire, an attorney's failure to question is less significant than when attorneys know nothing about the jurors prior to striking them. (*Reed, supra,* 4 Cal.5th at p. 1001, citing *People v. Taylor* (2010) 48 Cal.4th 574, 615.) Under these circumstances, the failure to ask additional questions during voir dire about

---

[4] As the Attorney General notes, several of defendants' comparative juror analysis concerns are raised for the first time on appeal.  "When a defendant asks for comparative juror analysis for the first time on appeal, [our Supreme Court has] held that 'such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent.' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 976.)

[5] For this reason, it is also not surprising that the prosecutor did not question one of the jurors about her husband's DUI arrest.

[6] Nothing suggests the trial court *unreasonably* limited time for voir dire, nor have the parties raised any such concern.

16

O.H.'s views of the ACLU, or the nature of her prior nonprofit experience, does not demonstrate pretext.

As to T.M., defendants contend that in spite of his negative experiences with the police, T.M. said he had also been helped by the police in other situations, and said he would be able to be fair and set his feelings about how minorities are treated aside in a case not involving race. As noted above, however, whether T.M. could be fair is relevant to a challenge for cause, not a peremptory challenge (*Mills*, *supra*, 48 Cal.4th at p. 176), and our courts have repeatedly held a negative experience with law enforcement is a race-neutral reason for excusal (*Reed*, *supra*, 4 Cal.5th at p. 1001). Defendants also argue another juror, Juror No. 69, stated a strong negative opinion about how minorities were treated by the justice system and noted on her questionnaire "there are bad + good in every work force." But that juror wrote that she had "strong negative opinions about race bias in the legal systems of the *southern* states."[7] (Italics added.) T.M., by contrast, wrote on his questionnaire that he felt minorities were not treated fairly in any county in California, including, presumably, Contra Costa County where defendants were on trial. Notably, Juror No. 69 also did not indicate she had a negative experience with law enforcement like T.M. did. (See *People v. O'Malley*, *supra*, 62 Cal.4th at p. 977 [reviewing court must ask "whether there were any *material* differences among jurors . . . other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges"].)

### C.A.

As to C.A., the trial court first found a prima facie case had *not* been made and then invited the prosecution to make a record. After the prosecutor stated his reasons for excusing Prospective Juror C.A., the trial court stated it had "stopped at the first level and permitted the People just to make the record. So I did not ask for a race-neutral

---

[7] The court questioned Juror No. 69 about this statement, noting "we're obviously not the southern states," and asked whether "there [is] any concern that [she] . . . would put [her] thumb on the scale one direction or the other because of [her] concern that the defendants are African-American?" She responded, "No."

justification because I saw one, which was cited by the People, it was quite loud." The court then denied the motion.

At the first stage of the *Batson/Wheeler* inquiry, the trial court considers whether the "totality of the relevant facts ' "gives rise to an inference of discriminatory purpose." ' " (*Scott, supra,* 61 Cal.4th at p. 384.) Although the court considers the entirety of the record of voir dire at the time the motion is made, certain types of evidence may prove particularly relevant. "Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.] A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Ibid.*)

Defendants contend an inference of discrimination was raised because by the time the prosecutor struck C.A., he was the third of four total African-American jurors in the venire. Prior to that, the prosecutor had used four peremptory challenges; C.A. was his fifth. By the time he struck C.A., the prosecutor had used three of his five peremptory challenges, or 60 percent, to "rid the panel of every black juror that had been called." As defendants acknowledge, however, a statistical pattern of striking minority jurors is not the only factor to consider in a prima facie case.[8]

Here, we conclude that notwithstanding the statistics cited by defendants, no inference of discrimination was raised because the record reveals at least three nondiscriminatory reasons to excuse C.A. that were "apparent from and 'clearly established' in the record." (*Scott*, *supra*, 61 Cal.4th at p. 384; *People v. Woodruff* (2018)

---

[8] Moreover, where (as here) the sample size is small, statistical disparities may carry "relatively little information." (*Bell*, *supra*, 40 Cal.4th at p. 598, fn. 4, disapproved on another ground in *People v. Sanchez*, *supra*, 63 Cal.4th at p. 86, fn. 13.)

5 Cal.5th 697, 751.) First, C.A. had previously served on at least one jury that failed to reach a verdict. It is well established this is a neutral reason to excuse a juror. (*Reed*, *supra*, 4 Cal.5th at p. 1001; *People v. Winbush* (2017) 2 Cal.5th 402, 438–439 (*Winbush*) [prior service on a hung jury " 'constitutes a legitimate concern for the prosecution, which seeks a jury that can return a unanimous verdict"].) Second, C.A.'s opinion that many officers "abus[e] their authority, especially involving black suspects," was also a valid basis for the challenge. (*Winbush*, at p. 439 [" 'A prospective juror's distrust of the criminal justice system is a race-neutral basis for excusal.' "].) Third, C.A.'s response to the prosecutor's questioning about the single-witness rule showed hesitation about applying it. Considering the totality of the circumstances, the record clearly establishes multiple nondiscriminatory reasons for excusing C.A. that dispel any inference of bias. (*Scott*, at p. 384; *Woodruff*, at p. 751.)

However, even if we were to proceed to the third stage of the *Batson/Wheeler* inquiry and examine the prosecution's stated reasons for discharging C.A., we would find no error. Defendants argue the prosecution's proffered justification that C.A.'s spouse was a teacher was "selective" because other seated jurors, including Jurors Nos. 185 and 174, also had spouses that were teachers. We are not persuaded. As our high court has explained, for a comparative analysis to be probative, a seated juror must have a " 'substantially similar *combination* of responses,' in all material respects" to an excused juror. (*Winbush*, *supra*, 2 Cal.5th at p. 443, italics added by *Winbush*.) "Although jurors need not be completely identical for a comparison to be probative [citation], 'they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.' " (*Ibid.*) Defendants have not shown Jurors Nos. 185 and 174 had *any* other responses that aligned with C.A.'s. The same is true of defendants' argument that the prosecution's hung jury rationale was also selective. Though defendants note Juror No.

19

69 had previously served on a hung jury, they did not show any of her other responses were like C.A.'s.[9]

Defendants also contend the prosecutor's reason that C.A. would not accept the testimony of a single witness was also "selective" because Juror No. 33 similarly said she would believe a single witness but "they'd have to be a credible witness." Defendants note the prosecution "quickly thanked" the witness and "cut off this line of questioning" after she gave this answer and appeared to be trying to clarify her response. But as the Attorney General notes, Juror No. 33 stated unequivocally that she would follow the rule so long as the witness was credible, whereas C.A. stated he would "attempt" to follow that rule, and would follow it if he believed the witness "strongly." Regardless, even if C.A. and Juror No. 33 shared this answer in common, defendants have not shown they had " 'a substantially similar *combination* of responses.' " (*Winbush, supra,* 2 Cal.5th at p. 443, italics added by *Winbush*.)

We also observe that the prosecutor specifically noted C.A. was not the only juror against whom he exercised a peremptory challenge based on the single-witness rule. When questioning a group of seven jurors that included C.A., the prosecutor asked if anyone had issues with relying on a single witness to prove a case. Juror No. 82[10] told the prosecutor "one witness might not be enough for me" and "I'd have to have something else." The prosecutor then asked if anyone else shared Juror No. 82's concerns about the single-witness rule: "Does . . . . anyone think: Hey, you know what, I can't do it with one. You know, I can't do it. I have to have something else. I have to

---

[9] Bryant argues like C.A., Juror No. 69 had a " 'strong' " opinion that minorities were not treated fairly in the criminal justice system. But as explained above, Juror No. 69 opined minorities were not treated fairly in the "southern states." Further, Juror No. 69 did not express discomfort with the single-witness rule like C.A. did. (See *Winbush*, *supra*, 2 Cal.5th at p. 442 [" ' "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable." ' "].)

[10] There is no evidence in the record that Juror No. 82 is African-American.

have physical evidence."   C.A. apparently identified himself and engaged in the colloquy with the prosecutor in which he stated he would "attempt to follow the law," one witness can "possibly" be enough, he "would think that more than witness is best," and he would "go along with the [one] witness if [he] believe[d] it strongly."  When explaining the reasons for the peremptory strike, the prosecutor said: "In addition, I kind of asked the group as a whole if anyone had any concerns with the testimony of a single witness, and so far to this point only two have had those concerns.  One was [Juror No. 82] who was in that same group of seven, and I excused her with one of my challenges because that concerns me.  It concerns me for a number of reasons, but just from a sheer prosecutor perspective, if someone has a problem with the testimony of a single witness, they tend to lean towards the defense . . . ."   The prosecutor's use of peremptory challenges against *both* Juror No. 82 and C.A. strengthens the inference that the exercise of those challenges was based on a race-neutral reason.

Finally, defendants did not raise the issue of comparative analysis in the trial court, and thus the prosecution never had the opportunity to explain perceived differences between seated jurors and C.A.  (See *Lenix*, *supra*, 44 Cal.4th at p. 623; *Winbush*, *supra*, 2 Cal.5th at p. 442 [" ' "a formulaic comparison of isolated responses [is] an exceptionally poor medium to overturn a trial court's factual finding" ' " concerning the subjective reasonableness of a prosecutor's proffered reasons for excusing a juror].)  As our Supreme Court explained in *Lenix,* "comparative juror analysis on a cold appellate record has inherent limitations.  [Citation.] . . . On appellate review, a voir dire answer sits on a page of transcript.  In the trial court, however, advocates and trial judges watch and listen as the answer is delivered.  Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact." (*Lenix*, at p. 622.)  While we may consider comparative juror analysis for the first time on appeal, the record must be adequate to allow such comparison.  (*Ibid.*)  Here, defendants' failure to raise the issue below denied the prosecutor the opportunity to make a such a record.

21

<u>*V.N.*</u>

The prosecutor excused Prospective Juror V.N. because (1) her son was arrested by the Pittsburg police; (2) he was 27 years old, the approximate age of defendants; (3) she worked in environmental protection—a job with a strong liberal slant; and (4) her husband was a postal worker. As noted above with respect to Prospective Jurors O.H. and T.M., these were legitimate, nondiscriminatory reasons to exercise a peremptory challenge. (See *Reed*, *supra*, 4 Cal.5th at p. 1001; *People v. Chism, supra,* 58 Cal.4th at p. 1317; see also *People v. Trinh* (2014) 59 Cal.4th 216, 242 [prosecutor's excusal of postal worker was not pretextual]; *People v. Rushing* (2011) 197 Cal.App.4th 801, 812 ["Courts which have directly addressed the issue of exercising peremptory challenges against postal workers have viewed this as a race-neutral reason."]) Defendants contend the prosecution's offered reasons were pretextual, though, because seated Jurors Nos. 174 and 179, who had prior DUI arrests, were asked only briefly about their interactions with the law, and were not asked in what county they were arrested. But V.N.'s son was arrested only two years before the current trial and was currently incarcerated at San Quentin serving a nine-year prison term, while Jurors Nos. 174 and 179 had been arrested seven and 20 years prior, respectively, for DUI's. These dramatically different circumstances render the comparative analysis unhelpful.

Defendants also reject the prosecutor's explanation that he excused V.N. because her son was approximately the same age as defendants, because at least three other jurors had children in the same age range. As the prosecution explained, however, his concern was not with V.N.'s son's age in and of itself, but that her son was a similar age to defendants *and* had been arrested by the Pittsburg Police Department. (See *People v. Trinh, supra,* 59 Cal.4th at p. 242 [*combination* of age, marital status, and parental status distinguished prospective juror from other jurors].) Defendants do not show any of the other jurors' children were similarly situated.

In sum, the prosecutor's explanations for excusing all four jurors, O.H., T.M., C.A., and V.N., are supported by substantial evidence. (*People v. Smith* (2019) 32 Cal.App.5th 860, 870; *People v. Mills, supra*, 48 Cal.4th at p. 175.) Because none of

those explanations lacked inherent plausibility or were contradicted by the record, we defer to the trial court's determination the prosecution was not motivated by a discriminatory purpose. (*Hardy, supra,* 5 Cal.5th at p. 76.)

## C. *Senate Bill No. 620*

Defendants have asked us to remand to allow the trial court to consider whether to exercise its newfound discretion, pursuant to Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620), to strike the previously mandatory firearm enhancement underlying their first degree murder convictions.[11] (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2.) Because the statutory amendment mitigates punishment by granting discretion to strike a previously mandatory enhancement, defendants are entitled to its benefit. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 424–428) The Attorney General argues we need not remand for resentencing, however, because the record shows the trial court would not have exercised its discretion to strike the firearm enhancements. Essentially, the Attorney General argues that because the trial court imposed aggravated terms for counts 3 through 5, we can assume it would not have exercised its discretion to reduce defendants' sentences by nearly half by striking their firearm enhancements.

We disagree it is clear from the record that the trial court would not have stricken the firearm enhancements. All the court said on this subject at sentencing is, "I am imposing an additional and consecutive 25 years to life." Accordingly, we remand to allow the trial court to exercise its discretion whether to strike the firearm enhancements. In addition, the abstract of judgment for both defendants incorrectly states the enhancement is under section 12022.23. This clerical error should be corrected to cite section 12022.53, if the trial court does not strike the enhancements. We express no opinion on how the trial court should exercise its sentencing discretion.

## D. *Sentence on Firearm Enhancements*

Finally, defendants argue the trial court erred in imposing a consecutive term of 25 years to life under section 12022.53, subdivision (d), because a subdivision (d)

---

[11] Jackson's opening brief states he joins Bryant's argument.

enhancement was never pled in the information, and the jury did not find true such allegations.[12] On the murder charged in count 1, the original information pled an enhancement allegation under section 12022.53, *subdivision (b)* and subdivision (e)(1) on the ground that a principal personally *used* a firearm in the crime. The allegation was under a heading that read, "*PC12022.53(d):* Special Allegation—Principal's Use Of A Firearm—Gang Case." (Italics added.) At trial, after both sides rested, the prosecution moved to amend the pleading to add section 12022.53, subdivisions (c) and (d) to the information. After reviewing the preliminary hearing transcript, the court allowed the prosecution to amend to add a section 12022.53, subdivision (c) allegation as to count 1. The jury found true allegations that "a principle [*sic*] personally *used* a firearm" and that "a principle [*sic*]*, personally discharged a firearm"* under section 12022.53, subdivisions (b) and (c). (Italics added.) At sentencing, the trial court imposed a consecutive term of 25 years to life under subdivision (d).

The Attorney General concedes the trial court erred and asks us to order the abstract of judgment amended. Because we must remand to allow the trial court to exercise its discretion whether to strike the enhancements under section 12022.53, we direct the trial court to impose a determinate term of 20 years for each defendant under subdivision (c) if it decides not to strike the enhancements.[13]

### III. DISPOSITION

We remand for the trial court to exercise its discretion whether to strike the firearm enhancements under Senate Bill 620. If the trial court does not strike the firearm enhancements, it shall impose 20-year terms for each firearm enhancement as to Bryant and Jackson under section 12022.53, subdivision (c). The trial court shall also ensure the clerical error on the current abstract of judgment citing section 12022.23 is changed to reflect the correct statute, section 12022.53. The abstract of judgment for Bryant should

---

[12] Jackson raised this issue in his opening brief; Bryant filed a notice of joinder in the argument the day after he filed his opening brief.

[13] Ultimately, section 12022.53, subdivision (c) will have no application to Bryant if the trial court grants a section 1170.95 petition.

also be corrected to state the court security fee is $160 and the criminal conviction assessment is $120, as ordered by the trial court at sentencing. The trial court shall forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. The matter is also remanded to give Bryant the opportunity to file a section 1170.95 petition. The judgments are otherwise affirmed.

_____

Margulies, J.

We concur:


_____

Humes, P. J.



_____

Banke, J.

A152029
*People v. Bryant and Jackson*

26

Humes, P. J., concurring.

The lead opinion concludes that the prosecutor's striking of all six of the black jurors in the jury pool—by using a challenge for cause against two and by using peremptory challenges against the other four—was lawful under the *Batson/Wheeler*[1] framework (hereafter, the *Batson* framework). This conclusion is compelled under California precedent, and I therefore concur. But I write separately because this case highlights the serious shortcomings with the *Batson* framework, and I join those who are calling for meaningful reform.

The *Batson* framework was designed to protect against "[p]urposeful racial discrimination" in exercising peremptory challenges (*Batson*, *supra*, 476 U.S. at p. 86), and it has been extended to apply to discrimination based on other types of group bias. (*People v. Bell* (2007) 40 Cal.4th 582, 596.) But there are good reasons to question whether its promise is being realized. To begin with, requiring a showing of purposeful discrimination sets a high standard that is difficult to prove in any context. Even when a state action disproportionately affects a cognizable group, the action amounts to an equal protection violation only if it was taken " 'at least in part "because of," not merely "in spite of," its adverse effects upon [that] group.' " (*Hernandez v. New York* (1991) 500 U.S. 352, 359; see Barnes & Chemerinsky, *What Can* Brown *Do for You?: Addressing* McCleskey v. Kemp *as a Flawed Standard for Measuring the Constitutionally Significant Risk of Race Bias* (2018) 112 Nw. U. L.Rev. 1293, 1301–1306 ["requiring proof of discriminatory purpose in order to demonstrate an equal protection violation . . . [has] dramatically lessened the ability of claimants to use the Constitution to create a more just society"].) Purposeful discrimination is especially hard to prove in the context of peremptory challenges, because attorneys can easily come up

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258.

with supposedly non-biased justifications to strike potential jurors.  Under California precedent, even a justification that is trivial, speculative, or objectively unreasonable suffices to disprove purposeful discrimination if it is facially neutral and the trial court credits it as being subjectively genuine.  (*People v. Hardy* (2018) 5 Cal.5th 56, 76–77.) Hence, "[a]ny prosecutor can easily assert facially neutral reasons for striking a juror" that are highly likely to pass muster.  (*Batson*, at p. 106 (conc. opn. of Marshall, J.).)

The *Batson* framework not only makes it easy to assert justifications that mask bias but also makes it nearly impossible for trial courts to meaningfully evaluate those justifications.  How can a court critically consider reasons for striking a juror when, as a matter of law, they can be trivial, speculative, and unreasonable?  The framework further discourages thoughtful assessment because, by putting the focus on intentional discrimination, it places trial courts in the uneasy position of appearing "to accuse attorneys of deceit and racism in order to sustain a *Batson* challenge."  (*State v. Saintcalle* (Wash. 2012) 309 P.3d 326, 338 (en banc); see also Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection:  The Problems of Judge-dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions* (2010) 4 Harv. L. & Pol'y Rev. 149, 162 (hereafter Bennett).)

The inadequacies of the *Batson* framework at the trial-court level are, in turn, exacerbated on appeal because an appellate court must give "great deference" to a trial court's determination that a facially neutral reason is genuine, unless " ' "the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both." ' " (*People v. Hardy*, *supra*, 5 Cal.5th at p. 76.)  It is hardly surprising that reviewing courts rarely upset trial courts' determinations on this point.  The distinction between trivial or unreasonable justifications, which are allowed, and inherently implausible justifications, which are not, is far from apparent.  "And to say that a . . . stated reason is 'supported by the record' is only to say that there is some evidence to support the reason or (in an even weaker formulation) that the stated reason is not contradicted by the record.  [Citation.] Again, that is a far cry from inquiring, based on all relevant circumstances, how likely it is that the stated reason was the actual reason for the strike."  (*People v. Mai* (2013)

2

57 Cal.4th 986, 1062–1063 (conc. opn. of Liu, J.).) In short, for several structural reasons "*Batson* . . . appears to have created a 'crippling burden,' making it very difficult for defendants to prove discrimination even where it almost certainly exists." (*State v. Saintcalle*, *supra*, 309 P.3d at p. 335.)

Even if the *Batson* framework helps to root out intentional discrimination in jury selection, it plainly fails to protect against—and likely facilitates—implicit bias. Implicit bias is increasingly accepted as pervasive throughout the criminal justice system, and it is particularly pernicious in the context of peremptory challenges. (See, e.g., Leshem, *Jury Selection as Election: A New Framework for Peremptory Strikes* (2019) 128 Yale L.J. 2356; Kang et al., *Implicit Bias in the Courtroom* (2012) 59 UCLA L.Rev. 1124.) By focusing on the genuineness or credibility of an attorney's justification for exercising a peremptory challenge, the framework ignores the essential nature of implicit bias, "which may be invisible even to the [attorney] exercising the challenge." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 267–268 (conc. opn. of Breyer, J.); *Batson*, *supra*, 476 U.S. at p. 106 (conc. opn. of Marshall, J.) [a prosecutor's " 'seat-of-the-pants instincts' as to how particular jurors will vote . . . may often be just another term for racial prejudice"].) Given that the critical factor is whether a proffered reason is subjectively genuine, it is hard not to wonder "[h]ow . . . trial judges [can] second-guess an instinctive judgment the underlying basis for which may be a form of stereotyping invisible even to the prosecutor." (*Rice v. Collins* (2006) 546 U.S. 333, 343 (conc. opn. of Breyer, J.).)

Moreover, " ' "[u]nless a discriminatory intent is *inherent* in the prosecutor's explanation," ' " the reason will be deemed neutral." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158, quoting *Purkett v. Elem* (1995) 514 U.S. 765, 768 (per curiam), italics added.) Many justifications that have been categorically approved by courts as neutral under this standard are hardly so. California courts, for example, have "repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement" or "skepticism about the fairness of the criminal justice system." (*People v. Turner* (1994) 8 Cal.4th 137, 171; *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386.) Even a prospective juror's belief that the system is unfair

3

*to racial minorities* qualifies "as a valid race-neutral ground for excusing a juror." (*People v. Winbush* (2017) 2 Cal.5th 402, 439.)  In light of the undeniable evidence that some minority groups—particularly black men—have been overpoliced and subjected to harsher sentences than others, it hardly seems race neutral to categorically allow potential jurors to be stricken simply because they have had contact with or hold negative opinions about law enforcement or the judicial system.  Reflexively allowing these strikes compounds institutional discrimination by excluding more minorities than non-minorities from juries, diminishes public confidence in the fairness of our justice system, and undermines the value of having juries that represent a fair cross-section of the community, as it risks "losing perspectives that may be essential to the ideal of a jury made up of diverse experiences and viewpoints."  (Roberts, *Disparately Seeking Jurors: Disparate Impact and the (Mis)use of* Batson (2012) 45 U.C. Davis L.Rev. 1359, 1403.)

In this case, the prosecutor justified one of the challenges for cause and all four peremptory challenges against black prospective jurors on the basis of their experiences with or attitudes toward law enforcement and the justice system.  K.B., the first black juror struck for cause, stated that her minor cousin had been unfairly treated by being questioned as a criminal suspect without an adult present.  K.B. also expressed the belief that "the judicial system is corrupt" and "the United States is imprisoning black men and other minorities to continue free labor."  Defendants do not contest that these beliefs justified the prosecutor's challenge for cause.

The justifications for using peremptory challenges to strike the remaining black prospective jurors, however, were progressively weaker.  O.H. indicated she believed her nephew was treated unfairly in a DUI case, and, according to the prosecutor, it "affected" her.  T.M. believed the police lied to him after pulling him over on one occasion, and he expressed the view that "[m]inorities aren't treated fairly in any county in California."  C.A. believed the majority of law enforcement officers are excellent and had close personal relationships with some, but he also believed too many abuse their authority, especially with respect to black suspects.  Finally, V.N. disclosed that she had a son, with

4

whom she was not close, who had been arrested by one of the agencies involved in this case.

Under controlling precedent, the peremptory challenges against O.H. and T.M. were permissible given these jurors' negative experiences with the criminal justice system. The peremptory challenge against C.A. was also permissible, notwithstanding his general positive feelings about law enforcement, because he believed some police officers abuse their authority. And the peremptory challenge against V.N. was permissible because of the arrest and incarceration of her son. But by the time the prosecutor exercised a peremptory challenge against her, all five of the other black prospective jurors had been dismissed. V.N. knew hardly anything about the details of her son's case, and she did not suggest that his experience had any negative impact on her view of law enforcement or the judicial system. The only other reasons the prosecutor gave for challenging her were that her longtime employment with the federal government involved environmental protection and her spouse was a postal worker. In my view, something is wrong with the *Batson* framework when such flimsy reasons essentially insulate from review the striking of *the sixth and final* black person in the venire.

In his concurring opinion in *Batson*, Justice Marshall wrote, "The decision today will not end the racial discrimination that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely." (*Batson*, *supra*, 476 U.S. at pp. 102–103.) Recognizing the problems with peremptory challenges, a long and growing list of jurists, academics, and others have joined the call for their elimination or reform. For example, Judge Mark Bennett, who recently retired from the federal district-court bench and who has written and spoken extensively on the subject, has expounded on the rationale for eliminating peremptory challenges. "Permitting only for[-]cause strikes avoids many of the problems with *Batson*. [A trial] court would not simply evaluate whether the proffered reason was a pretext for discriminatory animus as the last step of a burden-shifting analysis weighted in favor of upholding the peremptory strike. It would instead evaluate the sufficiency of the proffered reason as a basis for striking the juror in the first place. The onus of

justifying the strike would always lie with the party that wished to strike, rather than the one resisting the strike." (Bennett, *supra*, 4 Harv. L. & Pol'y Rev. at p. 167, italics omitted.) Eliminating peremptory challenges would be one way to reduce impermissible discrimination in jury selection.

The State of Washington has shown that other reforms are also possible. In 2017, the Washington Supreme Court adopted a "bright-line rule" requiring trial courts to "recognize a prima facie case of discriminatory purpose when the sole member of a racially cognizable group has been struck from the jury." (*City of Seattle v. Erickson* (Wash. 2017) 398 P.3d 1124, 1131.) The following year, it adopted General Rule 37, which states that trial courts must evaluate the reasons for peremptory challenges "in light of the totality of the circumstances" and deny them if "an objective observer could view race or ethnicity as a factor" in their use. (Wash. Gen. Rules, rule 37(e); *State v. Jefferson* (Wash. 2018) 429 P.3d 467, 477 (en banc).) The rule specifies that presumptively invalid reasons include those that might be disproportionately associated with a particular race or ethnicity, such as the potential juror's having had prior contact with law enforcement, having relationships with people who have been stopped by law enforcement, living in a high-crime neighborhood, having a child outside of marriage, receiving state benefits, or not being a native English speaker. (Wash. Gen. Rules, rule 37(g).)

Later in 2018, the Washington Supreme Court went further and incorporated General Rule 37's standard to modify the *Batson* test. (*State v. Jefferson*, *supra*, 429 P.3d at p. 470.) Under the modified test, "[i]f a *Batson* challenge to a peremptory strike of a juror proceeds to [the] third step . . . , then the trial court must ask whether an objective observer could view race or ethnicity as a factor in the use of the peremptory strike. If so, then the strike must be denied and the challenge to that strike must be accepted." (*Ibid.*) In turn, because the modified test applies an objective standard, a trial court's decision is reviewed de novo, not deferentially. (*Id.* at p. 480.)

California, in contrast, has been slow to adopt reforms. Yet if anything, the problems with peremptory challenges are magnified here because more of these

6

challenges are allowed than they are in most other jurisdictions:  Twenty peremptory challenges are allocated for offenses punishable by death or life imprisonment, ten for offenses punishable by imprisonment for more than one year, and six for other criminal offenses and in civil trials.[2]  (Code Civ. Proc., § 231.)  Our state should not stay on the sidelines any longer.  The time has come for the Legislature, Supreme Court, and Judicial Council to consider meaningful measures to reduce actual and perceived bias in jury selection.

_____

Humes, P.J.

_____

I CONCUR:

Banke, J.

_____

[2] In 2016, the Legislature reduced the number of peremptory challenges allowed in some less-serious criminal cases from ten to six.  (Stats. 2016, ch. 33, §§ 2–3.)  But unless the Legislature intervenes by January 2021, the less-serious criminal cases that are currently allocated six peremptory challenges will again be allocated ten.  (See Stats. 2016, ch. 33, § 3.)

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. Clare Maier

Counsel:

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Gary Timothy Bryant, Jr.

J. Courtney Shevelson, under appointment by the Court of Appeal, for Defendant and Appellant Diallo Ray Jackson.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Laurence K. Sullivan and Moona Nandi, Deputy Attorneys General for Plaintiff and Respondent.