Filed 11/18/21  P. v. Wells CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DARIUS WELLS,<br><br>    Defendant and Appellant. | C089736<br><br>(Super. Ct. No. 16FE004603) |

Defendant Darius Wells appeals a judgment entered following his conviction by jury of one count of having sexual intercourse with a child under 10 years of age (Pen. Code, § 288.7, subd. (a); statutory section references that follow are to the Penal Code) and one count of lewd and lascivious sexual misconduct with a child under 14 years of age (§ 288, subd. (a).  He contends the trial court erred in denying his *Batson/Wheeler* motion (*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*)).  Specifically, he argues the prosecutor's

1

peremptory challenges to exclude three African-American prospective jurors from the jury violated his state and federal right to equal protection and due process, requiring reversal. For the reasons we shall explain, we find no error and affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Given that defendant's challenge focuses on the voir dire proceedings, we briefly recount the history of this matter for context. The specifics of the voir dire itself will be discussed at length at the point of our analysis.

The People charged defendant with having sexual intercourse with a child under 10 years of age (§ 288.7, subd. (a); count one) and lewd and lascivious sexual misconduct with a child under 14 years of age (§ 288, subd. (a); count two). Defendant's first trial ended in a mistrial after the jury deadlocked 11-1 in favor of guilt.

As noted a moment ago, it is not necessary for the purposes of this appeal to set forth the evidence presented at trial relating to the charged substantive offenses.

On May 9, 2019, the jury found defendant guilty as charged.

On June 12, 2019, the trial court sentenced defendant to 25 years to life for count one. The court also imposed eight years on count two, which the court stayed pursuant to section 654. The court ordered defendant to pay a $300 restitution fine (§ 1202.4) and a matching, stayed $300 parole revocation restitution fine (§ 1202.45). The court declined to impose other fines and fees, but reserved jurisdiction over victim restitution. Defendant timely appealed.

## DISCUSSION

### I

### *The Batson/Wheeler Motion*

Defendant contends the trial court erred in denying his *Batson/Wheeler* motion after the prosecutor exercised peremptory challenges to exclude three African-American

2

prospective jurors from the jury, thus requiring reversal. As our Supreme Court recently explained, " 'Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender.' (*People v. Armstrong* (2019) 6 Cal.5th 735, 765 [ ] (*Armstrong*); see *Batson*[*, supra,*] 476 U.S. [at p.] 97 []; [*Wheeler, supra,*] 22 Cal.3d [ at p.] 276 [ ].) 'Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal.' [Citation.] When a party opposing a peremptory strike makes a prima facie case that the strike was motivated by impermissible discrimination (step 1), the proponent of the strike must offer a nondiscriminatory reason for that challenge (step 2). (*Armstrong*, at p. 765.) The question then becomes (step 3) whether the opponent of the peremptory challenge has shown it ' "more likely than not that the challenge was improperly motivated." ' (*Id.*, at p. 766; see also *Purkett v. Elem* (1995) 514 U.S. 765, 767 [ ] (*Purkett*).)" (*People v. Baker* (2021) 10 Cal.5th 1044, 1071 (*Baker*).)

Here, the prosecution used peremptory challenges to strike three of the four prospective African-American jurors remaining after for cause challenges. Defendant argued this fact alone established a prima facie case of discrimination. He then argued that using a comparative analysis of all prospective jurors, nothing in the background or answers of Ms. P., Ms. Y., and Ms. L. had distinguished them from other prospective jurors who had not been dismissed, aside from the fact that they were African-American. The court reserved decision on step one, and at step two, the Prosecutor explained the People had consistently struck individuals (both Caucasian and African-American) who knew *perpetrators* of sexual crimes, individuals who had *no* experience with children, and individuals, who through answers or demeanor, the People deemed inappropriate to sit on a case involving the sexual abuse of a three year old child by an adult. Having heard the argument of the parties, the trial court determined defendant had made a prima facie case, but "the prosecution has more than explained its reasons for exercising the

3

challenges [that] it did," and so the court denied the motion, remarking, "the Court finds there's no discriminatory process going on here."

A.    Background

*1.* Prospective Juror Ms. Y.

In response to court questioning, Ms. Y. said that she knew one person accused of assault and three victims of it. Further questioning established that the person accused of the assault had been accused of rape, which accusation was resolved when: "The person who accused them changed their story. Instead of it being pushed, they dropped it." Ms. Y. also said that she worked for Landry's and was studying psychology at Consumnes River College.

Defense questioning elicited that Ms. Y. was 20 years old, was taking a semester off, and had one and a half years left to obtain her degree. Defense counsel commented that was called a gap year, and Ms. Y. responded, "Some people call it a hiatus, but I'm [*sic*] been living a weird life --" Counsel then stated he was not going to ask about her weird life and moved on to other prospective jurors.

Defense counsel also asked the jury about their reaction to the charges. Counsel then directly asked Ms. Y., "Did you not have an emotional reaction when you heard these charges?" She responded, "I was confused." When counsel followed up, Ms. Y. stated, "I was just confused about how that person can be put in that predicament. It's like -- it's like when you go crazy it's like what, I think I'm going to try to explain what I heard." When asked, "Are you thinking how can this person, Mr. Wells, be in that seat charged with that crime? Or were you thinking -- well, what were you thinking? Tell me what you think." Ms. Y. stated: "It wasn't like how is he charged with that crime. It's like --" Defense counsel then stated, "I know it feels like everyone is looking at you. If you don't think you can answer, tell me that too." She then responded, "I can't answer." Counsel indicated he may come back to her later, but did not.

4

In response to questioning by the prosecutor, Ms. Y. explained she had visited a person in custody that was accused of a "sex-related" crime, and she did not feel that person was treated fairly throughout the process.

2.    Prospective Juror Ms. L.

At the outset of the voir dire, Ms. L. filed a hardship request related to her employment, but then told the trial court that she would be paid during jury service. However, she did not know for how long she would be paid. Ms. L. worked as a learning through internships coordinator at a charter school with middle and high school students. She relayed two experiences relevant to the court's voir dire. First, her father had raped her mother's sister. Second, two years ago her "son did something really stupid. He was hanging out with some friends and somebody that was with him committed a crime and because he was there, he too was in trouble for it." Ms. L.'s son grew tired of going to court, so he pleaded guilty. He was then 17, still living with her, and they were hoping to have his record sealed soon.

Defense counsel clarified with reference to the rape, that Ms. L. was 10 years old when it happened. Ms. L. did not have a relationship with her father, but had forgiven him. She was never asked to participate in the proceedings. Regarding her son, he was arrested at 15 years of age and prosecuted by the Sacramento District Attorney. She had obtained a private attorney to defend him. Defense counsel also elicited that Ms. L. was a mandated reporter, but had never had to report anyone.

In response to questioning by the prosecutor, Ms. L. confirmed she never had to go to court, but was eventually told by her mother what had happened. "[T]hat was upsetting, of course, because you would never think that something like that would happen." Her mother knew how much she loved her dad, and "it is what it is." Ms. L. affirmed her father had made a mistake, and while she had no relationship with him, she had "forgiven him." She did not know where her father lived and had irregular contact

5

with her aunt. Ms. L. was protected from the process by her family, but knew that "he was convicted and he was going away for a long time." Her mother took them to visit once and then let them decide whether to visit again. It appears she did not go back to visit again.

Regarding her son, Ms. L. told the prosecutor her son was with two other people and the driver decided to rob someone of his or her phone. Her son did not have "direct involvement," but was there. She continued, "We were trying to fight the case, say that -- I understand he was there. So that's what it is, but he wasn't involved with it. I wasn't trying -- he didn't know that was something that was going to happen so we were trying to, you know -- it all worked out. His case is going to be sealed. So he made a stupid mistake hanging out with the wrong people and somebody made a decision to do something and because he was there, he was charged." Ms. L. and her son had attempted to fight the charge because it was a felony.

The prosecutor then clarified, "I am trying to find out how you feel about this as a parent when he wasn't the person who did the act. You indicated you felt he was treated fairly. Was that at the time --?" She responded, "It's been a process." The prosecutor followed-up, "At some point were you frustrated with the system?" and Ms. L. responded, "I was frustrated with the situation that my son put himself there and how -- he has never been a kid that was in trouble. Why couldn't he look at that?" Ms. L. had wanted the district attorney to look at his background and history. Her attorney had made those arguments and submitted letters. The settlement offer improved after that, and her son pleaded to a felony with his record being sealed in October. Ms. L. avoided saying what he pleaded guilty to. He was still on probation. Ms. L. relayed that her son was allowed to make the decision, and she supported him. She "liked, to a certain extent, [that] he took some responsibility for it. It's not the way [she] would have liked it to be, but he did take accountability and we're moving forward."

6

### 3. Prospective Juror Ms. P.

Ms. P. told the court that a close friend had been convicted of a DUI three years prior which resulted in jail time and fines. She had no negative feelings about the criminal justice system as a result. Ms. P. worked as an Enterprise Information Manager at the California State Teachers Retirement System (CalSTRS).

Ms. P. told the prosecutor that she used common sense every day and would not lose it just because she was in an unfamiliar setting such as jury service. Nor would she expect there to be a video of a sexual assault because "that's something that would happen behind closed doors." Ms. P. agreed that both adults and children forget things. Children can forget things big, small, happy, or sad. The prosecutor than asked Ms. P., "Do you have any experience regularly with children?" Ms. P. answered, "Not really, no." She affirmed that if the People proved the case, sympathy for the defendant would not make convicting him difficult.

### 4. Objection and Ruling

Following the excusal of prospective juror Ms. P., defendant made a *Batson/Wheeler* objection on the basis of race, specifically that defendant was African-American and believed the prosecutor had improperly used peremptory challenges on prospective African-American jurors Ms. P., Ms. Y., and Ms. L. Specifically, he argued that out of the juror pool of 105 people, approximately 10 had been African-American, and that following for cause challenges, the People's dismissal of three of the four remaining prospective African-American jurors demonstrated a prima facie case of racial discrimination.

Defendant also discussed the specifics of each juror's case, arguing each was not distinguishable from the other prospective jurors aside from race. Ms. P. was a manager at CalSTRS, who knew someone who had a prior DUI, had a relative who was a victim of robbery/burglary, and had agreed to evaluate a child witness on the testimony and

7

demeanor of that witness, in light of her own life experiences. Ms. Y. was a college student taking some time off from school. She knew both victims and an individual accused of crimes. She thought the accused individual was not treated fairly by the system, but had agreed to separate that experience from this case. Finally, Ms. L. worked with children at a charter school and had three children of her own, one of whom had gone through the juvenile justice system. While she disagreed with her son's choice to plead guilty, Ms. L. nonetheless indicated a respect for the justice system and its rules. While her father raped her aunt, she promised that would not affect her evaluation in this case.

The trial court deferred its ruling on whether this constituted a prima facie case and asked the Prosecutor to respond. The Prosecutor then explained that thus far the People had, in order, excused two Caucasian prospective jurors Mr. K. and Ms. E. The People then excused two African-American prospective jurors, Ms. Y. and Ms. L. The People then excused a Caucasian, Mr. B., and finally, Ms. P., who was African-American.

As to Ms. P., while she had positive attributes, such as her managerial experience, she lacked children and experience with children, which the prosecutor found unacceptable "on a case with a three-year-old who doesn't remember being molested." This was similar to the People's dismissal of Ms. E., a young professional who similarly had no experience with children. Further, Ms. P.'s demeanor suggested she was unhappy to be there. For example, when the Prosecutor offered Ms. P. water in response to her coughing, Ms. P. snapped rather than saying no thank you. Ms. P. also rolled her eyes at the defense attorney in response to one of his questions and never once responded or otherwise participated in the Court's "good morning" joking. The People intended to dismiss a Caucasian juror who similarly failed to respond to this.

8

As to Ms. Y., she was the only juror who failed to raise her hand in response to the defense's question about having an emotional reaction to the charges, and when asked, could not explain her reaction. She also knew someone accused of a sexual offense, which distinguished her from others who knew victims or who knew perpetrators of other kinds of crime. The prosecutor would not keep any prospective jurors "no matter what race or ethnicity" who "know people who are accused of a sexual assault crime." As further justification, Ms. Y. had described "the victim who was accusing the individual of the sex crime, I believe, she said something to the effect of, went crazy, and they didn't push it. . . . They, being the prosecuting agency presumably. That language she used concerned the People and connotation it had behind it." The People worried defense attorneys often argue the victim was "crazy" and did "not know what they were doing." "That's what happened in this case. The People aren't going to keep someone who has had that, an accusation of sexual assault." Finally, the People were not worried about Ms. Y.'s taking some time off from school, but were troubled by Ms. Y.'s statement that she was "living a weird life right now." This statement "shows that there is something that is going on in her life at this point that the People do not believe would be an appropriate juror for a case that is virtually -- that is penetrating a three-year old."

As to Ms. L., who the People had unsuccessfully sought to challenge for cause, she had a son who had been charged with robbery under an aider and abettor theory. She believed her son who had disclaimed knowledge of the plan to commit the robbery. Given this, Ms. L. thought her son's charging was "unfair" in that "he was charged and took a felony, for what she views as a minimal involvement in a strike offense." She disagreed with his decision to plead guilty even though she supported him and his decision to accept "accountability." Ms. L. acknowledged that her feeling that she did not have "animosity toward the system" had "been a process." The Prosecutor did not want "someone who has had negative feelings towards the justice system at some point

. . . on a jury on what could be the most serious case you could have." Also concerning was that Ms. L.'s father had raped her mother's sister. "We don't want anybody on the jury who has someone who has been accused of a sexual crime, especially rape, and then who actually indicates is forgiving of it." The People feared such a person would "have sympathy for the defendant when making their [final] decision."

Finally, the Prosecutor stressed that the People had unsuccessfully fought against the for cause challenge of another African-American juror Mr. R., who the defense had not wanted to serve, and there was still a prospective male African-American juror set to be empaneled who the People had no intention of striking. Given these circumstances and that the People had only excused three of the 10 African-American jurors, the defendant had not made a prima facie showing, and in any event, the People had "very good reasons" for excusing the prospective African-American jurors, they did and had "argued zealously to keep one."

In response, the defendant argued that the Prosecutor had used 50 percent of her challenges on African-Americans who constituted at best 10 percent of the jury pool. While defendant had noted that Ms. P. "manifested mannerisms," had refused water, and refused to say good morning, these were not valid reasons for excusing her from jury service. Further, there were "a lot" of other jurors remaining in the pool who did not have children. Finally, as to Ms. Y., while she had stuff going on and had "friends and family members who have had run-ins with the law or have been victimized," she nonetheless had "indicated clearly that it would not affect her in the decision making." She was not the only person to not raise her hand in response to having a "guttural reaction to the charges" and such a response did not preclude her being "fair in reaching a verdict in this case."

In reply, the People highlighted that being "fair and unbiased" was not the applicable standard for the *Batson/Wheeler* inquiry, and that "[t]he People have the right

to choose the jurors that they think are best." Ms. P. was unacceptable not because she did not have children, but because she had "no experience with children, even if it's nieces or nephews. She's the only one who said a hard no."

Having heard the argument of the parties, the trial court noted: "The proper analysis in this type of matter is whether the prosecutor was, quote, motivated in substantial part, end quote, by race . . . . Also the proper focus in this analysis is the subjective genuineness of the responding parties' neutral explanation, not the objective reasonableness of that explanation . . . . [¶] In this particular case, it's difficult to determine what a prima facie case consists of since prima facie isn't defined. [¶] Given the vagueness of that definition, the Court will handle it this way. The Court would find that a prima facie case was presented by the defense; however, the Court also finds that the prosecution has more than explained its reasons for exercising the challenges than [*sic*] it did and would deny this motion. [¶] Again, the focus of the motion has been stated on the record, and the Court finds there's no discriminatory process going on here."

During later proceedings involving the striking of a prospective African-American juror who had had ex parte contact with defense counsel and defendant (the propriety of which is not challenged in this appeal), the court reiterated that it had been "more than satisfied with the independent explanations given for the exclusion of the three previous jurors. . . . And there just isn't evidence of a pattern, discriminatory intent, or a pattern that is motivated in substantial part by race."

B.     Analysis

As the Supreme Court explained in *Baker, supra*, 10 Cal.5th at pages 1076-1077: "Because the trial court found a prima facie case of racial discrimination and the prosecutor stated a reason for the strikes at issue, the question before us is whether defendant has shown it ' "more likely than not that" ' at least one of the ' "challenge[s]

11

was improperly motivated." ' [Citations.] 'The existence or nonexistence of purposeful racial discrimination is a question of fact.' [Citation.] [¶] The answer to this factual question will ordinarily depend 'on the subjective genuineness of the race-neutral reasons given for the peremptory challenge.' [Citation.] A justification based on a mischaracterization of the record could reveal a discriminatory motive [citation], but might reflect a mere error of recollection. [Citations.] Likewise, a justification that is 'implausible or fantastic . . . may (and probably will) be found to be pretext[ual],' yet even a 'silly or superstitious' reason may be sincerely held. [Citations.] Of course, the factual basis for, and analytical strength of, a justification may shed significant light on the genuineness of that justification—and, thus, on the ultimate question of discrimination. (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339 [154 L. Ed. 2d 931].) But the force of the justification is significant only to the extent that it informs analysis of the ultimate question of discriminatory motivation. (*People v. Cruz* (2008) 44 Cal.4th 636, 660.)" This is, at its essence, a credibility determination.

" 'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. omitted.)

In light of these rules, "a trial court's ruling on that ultimate question is ordinarily reviewed with deference. ' "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." ' [Citation.] 'A trial court is best situated to evaluate both the words and the demeanor of

12

jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes.' [Citations.] Thus, '[w]hen the trial court makes a sincere and reasoned effort to evaluate the [proffered] reasons, the reviewing court defers to its conclusions on appeal, and examines only whether substantial evidence supports them.' (*People v. Melendez* (2016) 2 Cal.5th 1, 15.)" (*Baker, supra*, 10 Cal.5th at p. 1077.)

### 1. The Trial Court's Ruling is Entitled to Deference

Defendant argues the trial court's cursory determination is not entitled to deference for failure to comply with its duty to conduct a "sincere and reasoned" evaluation of the People's proffered explanation. However, a lengthy and detailed explanation is not a prerequisite to a "sincere and reasoned effort to evaluate a peremptory challenge." (*Baker, supra*, 10 Cal.5th at p. 1077.) Rather, "[u]nder our precedent, '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility.' [Citations.]" (*Id.* at pp. 1077-1078.) A defendant may overcome this assumption by showing that " 'the proffered reasons lack[] inherent plausibility or [are] contradicted by the record' " or the record shows that the trial court misunderstood the standard to be applied. (*Id.* at p. 1078.) Consistent with the Supreme Court's recent decision in *People v. Battle* (2021) 11 Cal.5th 749, 776 footnote 9, we refuse defendant's invitation to utilize the passage of Assembly Bill No. 3070 (2019-2020 Reg. Sess.) to undermine the application of existing *Batson/Wheeler* jurisprudence.

Here, the reasons given by the prosecution for the People's exercise of its challenges of the contested jurors have been previously recognized as race neutral explanations. For example, the People excused jurors because of concerns arising from their negative experiences with the criminal justice system. (*People v. Winbush* (2017)

13

2 Cal.5th 402, 441-442 (*Winbush*) [arrest by and low opinion of same department that investigated the instant case]; *People v. Williams* (2013) 58 Cal.4th 197, 282-287 [African-Americans unfairly treated by justice system and relatives were unjustly prosecuted]; *People v. Scott* (2015) 61 Cal.4th 363, 385 [same district attorney had prosecuted prospector juror's son with help from same investigator; she thought prosecution was racially motivated and was upset about it]; *People v. Smith* (2019) 32 Cal.App.5th 860, 873, 877, 879 [belief criminal justice system was flawed].)

The People also excused jurors who had relationships with perpetrators alleged to have committed sexual related crimes because of the possibility that they would sympathize with defendant. (*People v. Rhoades* (2019) 8 Cal.5th 393, 433 (*Rhoades*) [belief brother had been wrongfully convicted of a sexual offense was a "readily apparent bases for objection from a prosecutorial view that tend[ed] strongly to dispel any inference of bias"]; *People v. Stanley* (2006) 39 Cal.4th 913, 938-939 (*Stanley*) [sympathy for defendant was race neutral reason to dismiss four African-American jurors].)

Further, the People excused jurors who had no regular experience with children, which the People viewed as essential given that the victim in the matter was a small child, who did not remember being molested. (See *People v. Neuman* (2009) 176 Cal.App.4th 571, 573 (*Neuman*) [upholding dismissal of three prospective jurors with limited life experience, including that they had no children]; see also *People v. Lewis & Oliver* (2006) 39 Cal.4th 970, 1014 [prosecutor's concern that rejection of complaining female witness testimony in a prior case could impact evaluation of critical female witness testimony in this case was race neutral justification].) Finally, the People excused jurors whose demeanor and answers in voir dire indicated an unwillingness and/or inappropriateness for sitting on a jury for a child sex offense, the *accuracy* of which was not challenged by the defense. (See., e.g., *People v. Hardy* (2018) 5 Cal.5th 56, 82 (*Hardy*) [failure to smile at prosecutor was race neutral reason for dismissal];

14

*People v. Howard* (2008) 42 Cal.4th 1000, 1018-1019 [flippant demeanor suggested desire to avoid service]; *People v. Walker* (1998) 64 Cal.App.4th 1062, 1069-1070 [request for hardship excusal as supporting reluctance to serve]; *Neuman*, at pp. 586-587 [juror's strange and unexplained statement supported peremptory challenge].)

These reasons were supported by the record as we shall now explain.

### 2.    Prospective Juror Ms. P.

The prosecutor identified two reasons for her dismissal of Ms. P:  (1) she had no experience with children and (2) her demeanor suggested she was unhappy to be there. We find the prosecutor's statement that she would not keep prospective jurors without experience with children and that Ms. P. lacked experience with children are supported by the record.

The prosecutor asked Ms. P., "Do you have any experience regularly with children?" to which Ms. P. responded, "Not really, no."  That the prosecutor genuinely worried about seating jurors without regular experience with children is supported by her earlier dismissal of Ms. E. (a female white prospective juror) who similarly lacked experience with children.  Ms. E. did not have children and when asked whether she had "any regular experience with children" responded, "Maybe once every couple weeks.  I have some cousins, but not very often."  Ms. E. did not have nieces or nephews.

Thus, we find substantial evidence supports the trial court's acceptance as a race neutral justification that the prosecutor was concerned about a juror's lack of experience with children in a case where the complaining minor victim no longer remembered her molestation.  (See *Neuman, supra*, 176 Cal.App.4th at p. 573; *People v. Lewis & Olive*r, *supra*, 39 Cal.4th at p. 1014.)

Regarding the concerns about Ms. P.'s demeanor, the prosecutor highlighted that when she offered Ms. P. water in response to her coughing, Ms. P. snapped rather than saying no thank you.  Ms. P. also rolled her eyes at the defense attorney during

15

questioning and never once responded or otherwise participated in the Court's "good morning" joking. While defendant challenged that this justified her removal from the jury, he did not challenge the accuracy of the prosecutor's observations, thus supporting the thought that these observations could be a race neutral ground. (*Hardy, supra*, 5 Cal.5th at p. 82 ["the prosecutor's demeanor observations, even if not explicitly confirmed by the record, are a permissible race-neutral ground for peremptory excusal, especially when they were not disputed in the trial court"].)

That the prosecutor was truly concerned with individuals evidencing a desire not to be there is supported by the prosecutor's expressed intention to dismiss a Caucasian juror that similarly failed to respond to the court's good morning overtures. As defendant did not renew the motion as to Ms. P. later in the voir dire, we cannot speculate as to whether the People actually followed through on this stated intention. (See *People v. Lenix*, *supra*, 44 Cal.4th at pp. 624 [appellate court reviews record before the court at the time of the decision; if subsequent events are relevant to the disposition of the motion, it is incumbent upon the complaining party to renew the motion].) Accordingly, we find substantial evidence also supports the trial court's implied determination that Ms. P.'s demeanor was a race neutral justification for her dismissal. (See *Hardy, supra*, 5 Cal.5th at p. 82; *People v. Howard, supra*, 42 Cal.4th at pp. 1018-1019.)

### 3. Prospective Juror Ms. Y.

The People excused Ms. Y. for three reasons: (1) because of her answer about her lack of emotional response to the charges; (2) because she knew someone accused of rape and felt he had been unfairly treated by the system; and (3) because she stated she was "living a weird life right now" demonstrating "something that is going on in her life at this point that the People do not believe would be an appropriate juror for a case that is virtually -- that is penetrating a three-year old."

Taking the first and third reasons together, we find substantial evidence supports as race neutral justifications that the prosecutor was concerned about her inability to cogently explain her reaction to the charges, as well as her statement that she was "living a weird life." (See *Neuman, supra*, 176 Cal.App.4th at pp. 586-587 [juror's strange and unexplained statement supported peremptory challenge].)

Here, defense counsel asked the prospective jurors collectively whether they had had an emotional response to the charges. He then directly asked Ms. Y., who apparently had not raised her hand, "Did you *not* have an emotional reaction when you heard these charges?" (Italics added.) Ms. Y. responded, "I was confused." When asked what about, she stated, "I was just confused about how that person can be put in that predicament. It's like -- it's like when you go crazy it's like what, I think I'm going to try to explain what I heard." Defense counsel then asked her to explain and she stated, "It wasn't like how is he charged with that crime. It's like --" On a cold record, we do not know how much time before counsel then stated, "I know it feels like everyone is looking at you. If you don't think you can answer, tell me that too." Ms. Y. then responded, "I can't answer." This lack of cogence concerning her reaction to charges that accused an adult male of having sexual intercourse with a three year old clearly supported the prosecutor's concerns about seating Ms. Y. on the jury.

In a similar vein, Ms. Y. had earlier told the court that she was a psychology student, but defense counsel elicited that she had taken the semester off. When counsel remarked about that being "a gap year," Ms. Y. responded, "Some people call it a hiatus, but I'm [*sic*] been living a weird life." Counsel did not ask Ms. Y. to explain why her life was weird, and expressly stated that he was not going to ask her about it. Again, any prosecutor would have concerns about any prospective juror who openly told the court that she or he was "living a weird life." Thus, Ms. Y.'s unusual and unexplained answers

17

concerning her emotional reaction and her life were race neutral justifications for excusing her from the jury panel. (See *Neuman, supra*, 176 Cal.App.4th at pp. 586-587.)

Finally, the prosecutor explained she had excused Ms. Y. because the People would not keep any prospective juror "no matter what race or ethnicity" who "[knew] people who are accused of a sexual assault crime." Ms. Y. was only one of a few people who knew people "charged with a sex offense." The prosecutor distinguished this class of prospective juror from individuals who knew victims of sexual assault and both victims and perpetrators of general crimes. Further, not only did Ms. Y. know someone who had been accused, but she said that the victim "went crazy" and "they didn't push it." The connotation associated with her language worried the People.

Substantial evidence supports the court's acceptance of this as a race neutral justification. (*Rhoades, supra*, 8 Cal.5th at p. 433; *Stanley, supra*, 39 Cal.4th at pp. 938-939.) Ms. Y. told the trial court that she knew someone accused of rape, that "[t]he person who accused them changed their story," and that "[i]nstead of it being pushed, they dropped it." As elicited by the prosecutor, Ms. Y. had visited this person in custody, and she did not feel they had been treated fairly by the system.

While we recognize that the prosecutor appears to have been mistaken in her belief that Ms. Y. had stated that the victim had gone "crazy," instead of Ms. Y.'s actual statement that "it's like when you go crazy. . . ," we do not find this mistake under the circumstances present in this case to support an inference of racial motivation. (See *Hardy, supra*, 5 Cal.5th at pp. 79, 81 [prosecutor's mistake that the prospective juror thought the "police" were not truthful, as opposed to the actual answer that reflected concerns about "prosecutors" did not require relief].) Because defendant did not challenge the prosecutor's characterization of Ms. Y.'s statements concerning the victim of the alleged rape, the record is silent as to the circumstances surrounding that misunderstanding, but we see no reason to doubt the prosecutor's sincerity of the

18

prosecutor's statements. (See *id.* at pp. 79-80.) "There is 'no *Batson* violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason.' " (*Ibid*.) Moreover, the other reasons given, which are supported in the record, amply justified her excusal.

### 4. Prospective Juror Ms. L.

Finally, the prosecutor provided two justifications for her excusal of Ms. L.: (1) Ms. L.'s experiences with her son's prosecution for a felony, which she viewed as "unfair" and for which she had held "animosity toward the system" and (2) her father had raped her aunt and went to prison, but she had forgiven him. Either of these justifications would support the prosecutor's race neutral exercise of a peremptory challenge.

In support of the People's sincerity regarding these justifications, we note that the People unsuccessfully challenged Ms. L. for cause on these grounds. This supports the People exercising a peremptory challenge. (See *Winbush, supra*, 2 Cal.5th at p. 441 ["When a prospective juror's hostility to law enforcement and the criminal justice system is not sufficient to support a dismissal for cause, it may well justify a prosecutor's peremptory challenge"].)

Further, we find substantial evidence supports the trial court's implied findings that the People exercised race neutral strikes when excusing Ms. L. on these grounds. Regarding Ms. L.'s son, the People were concerned that he had been charged with robbery under an aider and abettor theory, and Ms. L. believed her son, who had disclaimed knowledge of the plan to commit the robbery. Given this, Ms. L. thought her son's charging was "unfair" in that "he was charged and took a felony, for what she views as a minimal involvement in a strike offense." Ms. L. disagreed with his decision to plead guilty, even though she supported him and his decision to accept "accountability." Ms. L. acknowledged that her feeling that she did not have "animosity toward the system" has "been a process." The prosecutor did not want "someone who

has had negative feelings towards the justice system at some point . . . on a jury on what could be the most serious case you could have."

Concerns related to her son's prosecution by the same district attorney's office are inherently reasonable and a race neutral justification supporting the prosecutor's peremptory challenge. (*Winbush, supra*, 2 Cal.5th at pp. 441-442 [arrest by and low opinion of same department that investigated the instant case]; *People v. Williams, supra*, 58 Cal.4th at pp. 282-287; *People v. Scott, supra*, 61 Cal.4th at p. 385; *People v. Smith, supra*, 32 Cal.App.5th 873, 877, 879.) They are also supported by Ms. L.'s statements during voir dire, which were accurately described by the prosecutor.

Moreover, the prosecutor's concerns regarding Ms. L.'s father's rape of her mother's sister were consistent with the prosecutor's stated justifications regarding Ms. Y. The prosecutor stated, "We don't want anybody on the jury who has someone who has been accused of a sexual crime, especially rape, and then who actually indicates is forgiving of it." The prosecutor feared such a person would "have sympathy for the defendant when making their [final] decision." Such concerns are a racially neutral justification for striking Ms. L. (See *Rhoades, supra*, 8 Cal.5th at p. 433; *People v. Scott, supra*, 61 Cal.4th at p. 385; *Stanley, supra*, 39 Cal.4th at pp. 938-939.) Substantial evidence also supports the trial court's implied finding regarding them.

Here, Ms. L. disclosed to the court that her father had raped her mother's sister. Defense counsel elicited that Ms. L. was 10 years old when it happened, and that while she does not have a relationship with him, she had forgiven him. The prosecutor elicited that while Ms. L. never had to go to court, she was eventually told by her mother what had happened, and it was very upsetting. Ms. L. stated, "[T]hat was upsetting, of course, because you would never think that something like that would happen." Ms. L. affirmed her father had made a mistake, she has "forgiven him."

The People had indicated an intention to dismiss any juror with a relationship with an individual charged with a sexual crime. The rape of Ms. L.'s aunt by Ms. L.'s father clearly fell within this category, and we need not speculate concerning the scope or circumstances surrounding Ms. L.'s forgiveness of her father. Whether Ms. L. might have specifically endorsed her father's conduct does not control whether she may have felt sympathy for defendant in this case. Her forgiveness of her father, for whatever it was worth, further supported the People's concerns about possible sympathy.

### 5. Comparative Analysis

The Supreme Court has previously explained that part of our inquiry into the third stage of the court's findings includes comparisons between challenged prospective jurors and those who were allowed to serve. (*Winbush, supra,* 2 Cal.5th at p. 442.) " 'The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor. [Citations.]' [Citation.] 'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.' (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241 [162 L. Ed. 2d 196].) 'At the same time, "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an

21

exceptionally poor medium to overturn a trial court's factual finding." [Citation.]' (*People v. Taylor* (2009) 47 Cal.4th 850, 887.)" (*Winbush*, at p. 442.) Further, we need not comb the record ourselves in an attempt to discover whether disparities exist. Rather, we limit our analysis to those instances identified by defendant in his briefing. (*Id*. at pp. 442-443.)

Here, defendant argues a comparative analysis shows that Ms. P. was improperly excluded on the basis of race. However, defendant fails to demonstrate that any of the serving jurors had *no* regular experience with children (be it their own or otherwise), which was the primary reason for Ms. P.'s excusal, and for which the People had similarly excused a white, female juror, Ms. E.

Similarly, defendant complains that a comparative analysis shows Ms. Y. was excluded on the basis of race because despite the People's representation that Ms. Y. "was the only juror who had any experience with friends and/or acquaintances who had been victims of or charged with a sex crime," two jurors disclosed such experiences. Specifically, defendant complains that one juror had informed the court that his wife had been groped as a teen and another juror disclosed that a friend had been a victim of date rape.

Contrary to defendant's representation, we note the prosecutor actually singled out Ms. Y.'s experience with an individual accused of a sex-related offense, stating, "She's only one of the few people who have an individual who she knows who has been charged with a sex offense." Consistent with this, the prosecutor indicated she was not going to accept prospective jurors who had relationships with individuals accused of a sex-related crime as contrasted with individuals who knew perpetrators of other kinds of crimes or victims of sex-related crimes. Thus, while Juror "TJ:03" and Juror "TJ: 06" knew victims of sex-related crimes, they were not similarly situated to Ms. Y. That the People were genuinely concerned with individuals having such relationships is consistent with the People's striking of Ms. L., as well as prospective juror Mr. K. (a white man), who

22

both knew individuals who had either been accused or convicted of a sex-related crime. Accordingly, we find a comparative analysis does not undermined the genuineness of the prosecutor's stated reasons and supports the trial court's determination.

DISPOSITION

The judgment is affirmed.

_____
HULL, J.

We concur:

_____
BLEASE, Acting P. J.

_____
KRAUSE, J.